# Court of Appeals.

November 23, 1897.

# PEOPLE v. HADLEY ADOLPHUS SUTHERLAND.

1. CRIMINAL LAW—COURT OF APPEALS.

Court of appeals has power, in a capital case, to review the facts and to set aside a verdict of conviction, when not supported by sufficient evidence, or when it appears that injustice has been done. But, where there is a conflict in the evidence, or where opposing inferences are to be drawn from the facts, it is the province of the jury to determine what the truth is ; and the verdict, under such circumstances, is conclusive upon the courts.

2. SAME.

Where the facts and circumstances testified to justify the jury in finding that the shooting was intentional, and that it was the result of sufficient deliberation and premeditation on the part of the accused to warrant the verdict, the court of appeals is not warranted in interfering with the determination of the jury upon the facts.

3. SAME—EVIDENCE.

Upon the trial of an indictment for the murder of a woman with whom defendant was living in adultery, it is competent for the prosecution to prove the fact that the deceased was the wife of another man ; that defendant had enticed her away from her husband, and was living in meretritious relations with her at the house where the offense was committed. The relations of the parties to each other, and the facts leading up to such relations, are competent for the consideration of the jury.

4. SAME—MOTIVE.

While an adequate motive for the act is not indispensable to a conviction, yet any fact from which the jury may legitimately find or infer that such motive was acting upon the defendant's mind is competent.

5. SAME.

The motive for the commission of a homicide is always open to inquiry at the trial, and considerable latitude in the proof is always allowed.

6. SAME—EVIDENCE.

Evidence that the defendant, on the afternoon of the day of the shooting showed the witness a pistol, remarking at the same time that " this means business some day," is competent, as tending to prove, not only that defendant had the pistol in his possession at the time, but that he intended to use it upon some one.

7. SAME—LETTERS.

Letters written by the deceased to defendant, which apprised him of the claims which the deceased made and of her dependence upon him, are

admissible, not for the purpose of proving any facts stated in them, but only for the purpose of showing how the deceased regarded her relations with defendant.

**8. SAME.**

Letters of the deceased, sent to the defendant and found in his possession, are not, as matter of law, incompetent evidence under all circumstances on the trial of an indictment for homicide. It depends upon the contents of the letters and the nature of the information which they convey to the minds of the accused.

**9. SAME.**

If such letters contain nothing bearing upon the question of motive, they are harmless and of no account, and their admission is not reversible error unless they contain some matter on other subjects calculated to prejudice the defendant.

**10. SAME—REVERSAL.**

In the administration of criminal justice, the court of appeals, before disturbing a judgment for an erroneous ruling at the trial, must be able to see that the ruling tended in some way to prejudice the rights of the defendant.

Appeal from a judgment convicting defendant of murder.

Arthur H. Cameron, for appellant.

Herman H. Baker, for respondent.

O'BRIEN, J.—It is undisputed that on the night of the 22d of March, 1897, the defendant, a young colored man about 19 years of age shot and killed one Sarah Wren in an apartment house in Brooklyn, where they lived. The deceased was the wife of another man, and she was at the time living with the defendant in meretricious relations. The only question in the case, upon the merits, is whether the evidence produced upon the trial was sufficient to establish the intent to kill, and the deliberation and premeditation essential to constitute the crime of murder in the first degree. The learned counsel for the defendant contends that the shooting was not accompanied by the intent or the deliberation and premeditation necessary to constitute the crime of which he was convicted, and he insists that this court should set aside the verdict, as unsupported by sufficient evidence. In this view of the case, it becomes necessary to state some of the leading facts which pre-

ceded the tragedy : It appears that the defendant's relation with the deceased commenced while she was living with her husband, and that about a month after the birth of a child she abandoned her husband, and, with the child, took up her abode with the defendant. The proof tended to show that on the evening of the homicide the defendant had been drinking ; that for some reason, which does not distinctly appear, a quarrel took place between him and the deceased. The parties lived on the first floor of the house, which consisted of a front room or parlor, a kitchen in the rear, and a hall bedroom opening into the kitchen and a hallway. The hall bedroom was occupied by the defendant and the deceased. The parlor and kitchen were occupied by other parties, all colored people ; but what particular rooms, if any, had been assigned to each, does not distinctly appear. The fair inference is that all the inmates used the rooms, to some extent, in common. The quarrel commenced in the front room or parlor. The parties then retired to the bedroom, where it seems to have been continued. The defendant assaulted and struck the deceased at least two or three times during the quarrel, and the deceased in the end, seems to have taken refuge in the front room. The defendant then went into the kitchen, dressed himself, and was heard to say that he did not care what became of himself. Then, going into the bedroom, which the deceased had left, he almost immediately fired a shot from a pistol, the bullet entering the ceiling of the bedroom. The prosecution claims that this shot was fired by the defendant for the purpose of testing the weapon, or at least of making sure that he understood how to handle it. After firing this first shot the defendant then came out of the bedroom, and standing in the doorway between the kitchen and front room, fired the second shot at the deceased, who was near a front window, and in line with one of the other women. This shot missed her, striking a picture on the wall near her. The two women then rushed out of the room, passing through the hall towards the street, when the defendant fired a third shot, which also missed, and passed through the wall into an adjoining apartment. The women (for there were then three of them) continued running towards the front door, followed by the defendant. The deceased, who was ahead, fell in attempting to reach the street, and one of the other woman also

fell. The defendant passed the two who were behind, and reached the deceased while she was down, and fired the fourth shot, which entered her lungs and lodged in the region of the heart, producing instant death. There is some conflict in the testimony as to the order in which the three women were passing or running out of the hall to the stoop into the street, and with respect to the defendant's position when he fired the fatal shot. But it is undisputed that the night robe of the deceased, her undergarments, and her skin, where the bullet entered, were burned by the discharge; showing clearly that the firing was at short range, if indeed, the muzzle of the pistol did not come in contact with her body. The defendant then fired a fifth shot at a policeman who was approaching, missing him, and then fled. He threw away his pistol in the street, and ran a couple of blocks, when he was captured without resistance. On being told what he had done, he did not attempt to explain or deny it. He asked the officers if she was dead, and, when they asked why he shot her, he answered: "I am jealous of her. * * * She is four months in the family way, and accuses me, and I know there are other men who have been with her." The revolver which he used had five chambers, and, when found, contained five empty cartridges. Upon these facts the question of intent, deliberation, and premeditation was clearly for the jury. It it difficult to see how the defendant's act could be attributed to accident or mischance. The fact that one of the shots entered the ceiling of the bedroom, and that two others missed, is of very little consequence, if it be true, as the testimony certainly tended to show that the defendant pursued the deceased, and deliberately fired a fourth shot into her body at such close range as to burn her clothing. It is undoubtedly true that this court has power, in a capital case, to review the facts, and to set aside a verdict of conviction, when not supported by sufficient evidence, or when it appears that injustice has been done. But where there is a conflict in the evidence, or where opposing inferences are to be drawn from the facts, it is the province of the jury to determine what the truth is; and the verdict, under such circumstances, is conclusive upon the courts. The evidence in this case would hardly warrant a verdict that the shooting was without intent to kill, or without deliberation and premeditation. The facts and

circumstances testified to justified the jury in finding that the shooting was intentional, and that it was the result of sufficient deliberation and premeditation on the part of the accused to warrant the verdict. We think, therefore, that this court, under such circumstances, would not be warranted in interfering with the determination of the jury upon the facts.

There are three exceptions in the record which have been argued by the defendant's counsel, and which require a brief notice. The husband of the deceased was sworn as a witness, and testified to their marriage; how the defendant became acquainted with his wife, and the fact that he frequently visited her at their home; that shortly after the birth of the child the wife disappeared, and the witness did not see her again until her death. It was competent for the prosecution to prove the fact that the deceased was the wife of another man; that the defendant had enticed her away from her husband, and was living in meretricious relations with her at the house where the offense was committed. The defendant certainly knew that the deceased was untrue to her husband, and there was evidence in the case from which the jury might find that he suspected that she was also untrue to him; that jealousy and ill feeling were the result of these suspicions, which might have furnish a possible motive for the commission of the offense. The relations of the parties to each other, and the facts leading up to such relations, were competent for the consideration of the jury. While an adequate motive for the act is not indispensable to a conviction, yet any fact from which the jury might legitimately find or infer such motive acting upon the defendant's mind was competent.

The prosecution proved by a witness who had a conversation with the defendant the afternoon of the day of the shooting that he showed her a pistol, remarking at the same time that "this means business some day." The testimony of this witness tended to prove, not only that the defendant had the pistol in his possession at the time, but that he intended to use it upon some one. Whether for the purpose of protecting himself against the husband of the woman with whom he was living, or upon the deceased, was for jury to say, under all the circumstances of the case. It has been suggested that this was a mere idle or boastful

remark, but we cannot affirm that such was the fact, as matter of law.

The prosecution put in evidence a number of letters written by the deceased to the defendant at various times during the period after the deceased had separated from her husband and attached herself to the defendant. They were found in the defendant's trunk after the homicide, and were admitted in evidence under objection and exception from the defendant's counsel. The letters appear on their face to be of the most affectionate character, and manifest a deep interest on the part of the writer in the defendant's welfare. They indicate very clearly that she understood the defendant to be the father of her child. It appeared from other evidence in the case that the deceased at the time of her death was pregnant, and that the defendant knew it. We think that the trial court committed no legal error in admitting these letters in evidence. They were, perhaps, not admissible for the purpose of proving any fact stated in them, but only for the purpose of showing how the deceased regarded her relations with the defendant. The letters must have presented to his mind a true picture of his real situation. Though still but nineteen years of age, and unmarried, they could not fail to impress him with the thought that in a certain sense, at least, he had assumed all the burdens and responsibilities of a family. Though the letters, as already stated, were couched in the most affectionate terms, they apprised him of the claims which the deceased made, and of her dependence upon him. Whether the situation in which he was placed, as depicted in these letters, furnished a sufficient motive for him to terminate the relations in the way that he did, was a question for the jury. The motive for the commission of a homicide is always open to inquiry at the trial, and considerable latitude in the proof is always allowed. As was said by Judge Parker in Hendrickson v. People, 10 N. Y. 31: "Just in proportion to the depravity of the mind would a motive be trifling and insignificant which might prompt to the commission of a great crime. We can never say the motive was adequate to the offense; for human minds would differ in their ideas of adequacy according to their estimate of the enormity of crime, and a virtuous mind would find no motive sufficient to justify the felonious taking of a human life." It would be impossible for us to say

that the entanglements in which the defendant became involved in consequence of his relations with the deceased, which were presented to his mind by the letters in question, might not have influenced his subsequent conduct in causing her death. At all events, it was not, we think, legal error to allow the letters to go to the jury. The letters were, it is true, simply the statements of the deceased; but they had been found in the defendant's possession, and presumptively their contents were known to him." They were just such letters as a wife would be expected to address to an absent husband. They conveyed to the defendant the idea that the deceased, at least, considered their relations permanent, and practically that of husband and wife. It cannot be denied that letters or other statements of the deceased that came to the knowledge of. the defendant might under certain circumstances, furnish a motive for the defendant's act. If, for instance, these letters disclosed to his mind the fact that the deceased was in possession of some dangerous secret concerning him, which he was anxious should never be known, they would be admissible as furnishing a key to his conduct, and a possible motive for putting her out of the way. They were admissible if they contained any threats or other statements that had any bearing on the question of motive. While it would be difficult for us to say that they do contain anything of that character, it must be borne in mind that the motives which prompt the mind to the commission of crime are frequently obscure, often trivial, and never adequate. But suppose we assume that the letters contain nothing from which the jury could find or infer a motive for the homicide; how could they, in any proper or legal sense, have prejudiced the defendant? If they were mere harmless love letters, as they seem to be, they proved nothing that had not already been proven by the fact that the deceased left her husband for the defendant. The zeal of a prosecuting officer frequently projects into a criminal case some piece of evidence which is not strictly admissible, or is so near the border line as to become debatable. The exception in this case raises just such a question. But it is not every error that can be gleaned from the record of a trial that will warrant this court in reversing the judgment. The statute requires us to decide the case without regard to technical errors or defects, or to exceptions

which do not affect the substantial rights of the parties. Code
Civ. Proc. § 542. The only disputed questions of fact in this case
where the intent of the defendant, deliberation, and premeditation.
It is difficult, if not impossible, to conceive how these letters, if
they contained nothing bearing on the question of motive, could
possibly have prejudiced the defendant in the consideration of these
questions. If they did not prove motive, or tend to prove it, then
the case for the people was as strong without as with them, since
they proved nothing at all that had not already been established.
In the administration of criminal justice, this court, before dis-
turbing a judgment for an erroneous ruling at the trial, should be
able to see that the ruling tended in some way to prejudice the
rights of the defendant. Any other rule would render the statute
to which I have referred a dead letter. Assuming that the letters
proved nothing for the people, they proved nothing against the de-
fendant. If we cannot see that they tended legitimately to preju-
dice the defendant. we ought not to imagine or speculate upon
the possibility that the jury may have given them some weight to
which they were not entitled. This would render every possible
error in a prolonged trial a ground for granting a new trial. The
contention of the learned counsel for the defendant is that letters of
the deceased, sent to the defendant, and found in his possession,
are, as matter of law, incompetent evidence under all circumstances.
That proposition is not, we think, correct. It depends upon the
contents of the letters, and the nature of the information which
they convey to the mind of the accused; and, if the letters in
question contain nothing bearing on the question of motive, they
were harmless and of no account, unless they contain some matter
on other subjects calculated to prejudice the defendant. · We are
unable to find anything in them that could have the slighest ten-
·dency in that direction before any fair jury. When they were
offered at the trial, the defendant's counsel pointed out ·nothing in
them that was objectionable on this ground; and without calling
our attention now to anything of that character, he contents him-
self with the point they were inadmissible because they were only
statements of the deceased. Under these circumstances it is not
the duty of this court to hold that the letters were hurtful to the
defendant's case on some imaginary ground, even if they were not

strictly competent. It is impossible to say with any reason that the result of the trial could have been different if the letters had not been introduced at all. If they had been excluded by the court as immaterial, the case against the defendant would have remained the same, and there is not the slightest ground for the belief that the jury could or would have rendered any other verdict.

On the whole, we think that the defendant has had a fair trial, that the evidence was entirely sufficient to warrant the verdict, that no errors of law were committed upon the trial to his prejudice, and that the judgment must be affirmed.

All concur, except Bartlett and Martin, JJ., who dissent on the ground that the letters from the deceased to the defendant were inadmissible and prejudicial.

Judgment affirmed.