STATE, RESPONDENT, *v.* HOLLOWELL, APPELLANT.

(No. 6,089.)

(Submitted April 25, 1927.   Decided June 1, 1927.)

[256 Pac. 380.]

*Criminal   Law—Homicide—Self-defense—Intent—Motive—Evidence   Admissible—Appeal—Invited   Error—Sufficiency   of   Evidence.*

Homicide—Evidence of Prior Illicit Relations Between Defendant and Deceased Admissible on Question of Motive or Intent.
   1.   In a prosecution of a married man for the homicide of a young girl, *held* that the court erred in excluding evidence of improper relations between defendant and deceased resulting in pregnancy; that defendant procured an abortion to be performed, etc., such evidence being admissible to establish intent or motive for the commission of the crime, the rule being that considerable latitude in the proof is admissible for this purpose.

Same—Evidence of Other Crimes—Admissible, for What Purpose.
   2.   While in criminal prosecutions the general rule is that evidence of offenses other than the one for which defendant is on trial is not admissible, such proof is admissible where it is material as tending to show the intent or motive of defendant in the commission of the offense for which he is on trial, notwithstanding the fact that it also tends to show the commission by him of other crimes.

Same—Killing Admitted—Evidence of Intent or Motive Admissible.
   3.   The fact that defendant, charged with homicide, admitted the killing, asserting that it was done in self-defense, did not render inadmissible evidence tending to establish intent or motive.

Same—Appeal—Of Invited Error Defendant cannot Complain.
   4.   Where the trial court on objection of counsel for defendant charged with the murder of a girl erroneously excluded evidence of illicit prior relations existing between him and the deceased, offered for the purpose of establishing motive, he may not on appeal urge error in permitting prosecuting counsel in his opening statement to allude to such facts on the ground that because of the ruling of the court defendant was deprived of the opportunity to explain his relations with deceased; having invited the error, he may not complain of its result.

Same—Refusal to Grant Motion for Withdrawal of Charge of First Degree Murder—Nonprejudice to Defendant, When.
   5.   Where defendant was convicted of murder in the second degree he may not complain of error in overruling his motion for withdrawal from the jury of the charge of murder in the first degree.

Same—Plea of Self-defense—Conviction of Murder in Second Degree—Sufficiency of Evidence.
   6.   Evidence in a prosecution for the murder of a girl in which defendant, a married man pleaded self-defense, *held* not of such

2.   See 8 R. C. L. 201.

character as to justify a reviewing court in saying that the verdict of murder in the second degree should be reversed for insufficiency of the evidence, the facts and circumstances surrounding the killing not excluding the inference of malice, nor that he was not in actual danger when he fired the fatal shot in alleged self-defense, nor, as a reasonable man, believed himself in such danger.

[1]    Criminal Law, 16 C. J., sec. 1048, p. 547, n. 28, 29; sec. 1165, p. 601, n. 36, 37, 39.  Homicide, 30 C. J., sec. 364, p. 151, n. 33; sec. 401, p. 177, n. 70; sec. 405, p. 179, n. 31; sec. 406, p. 179, n. 37, p. 181, n. 53.
[2]    Criminal Law, 16 C. J., sec. 1132, p. 586, n. 98; sec. 1137, p. 589, n. 18; sec. 1139, p. 590, n. 25.
[3]    Homicide, 30 C. J., sec. 406, p. 181, n. 50 New.
[4]    Criminal Law, 16 C. J., sec. 2226, p. 890, n. 45; 17 C. J., sec. 3555, p. 209, n. 85.
[5]    Criminal Law, 17 C. J., sec. 3705, p. 348, n. 85, 88.  Homicide, 30 C. J., sec. 712, p. 446, n. 34, 35, 36.
[6].    Criminal Law, 17 C. J., sec. 3593, p. 255, n. 53.  Homicide, 30 C. J., sec. 560, p. 314, n. 54.

*Appeal from District Court, Carbon County; Robert C. Stong, Judge.*

D. A. HOLLOWELL was convicted of second degree murder and appeals from the judgment and the order denying a new trial. Affirmed.

*Mr. R. G. Wiggenhorn* and *Mr. John G. Skinner,* for Appellant, submitted a brief; *Mr. Wiggenhorn* argued the cause orally.

*Mr. L. A. Foot,* Attorney General, and *Mr. S. R. Foot,* Assistant Attorney General, for the State, submitted a brief, the latter arguing the cause orally.

MR. CHIEF JUSTICE CALLAWAY delivered the opinion of the court.

Defendant, D. A. Hollowell, was convicted of murder in the second degree for the killing of Emma Kirckel. The jury fixed his punishment at not less than twenty years nor more than forty years in the state prison. Judgment was entered on the verdict. Defendant appeals from the judgment and an order denying him a new trial. His counsel have assigned

eight specifications of error. The first six relate to alleged misconduct on part of counsel for the state in the opening statement to the jury, and in propounding questions to witnesses. These six are discussed by counsel for defendant under one head and we shall so consider them.

At the time of the homicide the defendant was a man forty-four years of age, the girl seventeen. The state charged defendant with murder in the first degree. The defendant admitted killing the girl, asserting that he had done so in self-defense.

In the opening statement counsel for the state told the jury, [1] over the repeated objections of counsel for the defendant, among other things, that the state would offer evidence tending to show that meretricious relations had existed between the defendant and Emma Kirckel; that as a result of such relations at some time during the months of September and October, 1925, she became pregnant, and the defendant took her to Billings, where an operation for abortion was performed; that after the operation she returned home and the defendant continued to pay attentions to her; that she went to defendant's ranch where she remained overnight; that the defendant went to the girl's mother some time before Christmas and asked the mother to use her influence with the girl in order that a marriage between himself and the girl might result; that the defendant went to a friend of his, a Mr. Lowe, who lives near Fromberg, and told of his confidential relations with the girl with particular reference to an occurrence at Fromberg on October 17; that during the latter part of January the defendant and the girl left in defendant's car for Butte, registering at Hunter's Hot Springs on the night of January 31, he in room 130 and she is room 131; that a few days before the girl was killed, the defendant, then in a highly excited and nervous state of mind, told Mr. Lowe that he was in trouble with the girl and did not know what to do and asked for advice, and Lowe told him that he had wronged the girl and the only thing for him to do was to treat her as a

man should "and some time maybe she would think something of him."

While the court permitted counsel for the state to tell the jury what the state proposed to prove in the particulars mentioned, when evidence was offered in confirmation of the statement, the court excluded it altogether.

When Emma Kirckel Gee, the mother of the deceased girl, was upon the stand, she testified that the defendant hired her to work for him about the 25th of June, 1925, upon his ranch west of Bridger, and she worked for him about a month. Defendant's wife was not there; she was not living with him. While Mrs. Gee was working for defendant, Emma came to live upon the ranch. The witness was asked concerning the relations between the defendant and Emma Kirckel, to which objection was made. The state then made an offer to prove by the witness the relationship which existed between the defendant and the girl from the time the defendant met her, about the last of June, 1925, until the tragedy. It was represented to the court that the evidence would show the relations between the defendant and the girl at the ranch, that sexual relations existed between the two, as a result of which the girl became pregnant, and an abortion was performed at the city of Billings some time before the 6th and 10th of December, 1925, at the instance of the defendant. The offered evidence, asserted Mr. Crippen, counsel for the state, would establish, incidentally, the crime of statutory rape and, incidentally, the crime of abortion procured by the defendant. The evidence was offered "to show and establish malice, premeditation and motive, and the state of mind of the defendant." Counsel for the defendant objected to the evidence upon the ground that it was incompetent, irrelevant and immaterial; that it would serve the purpose merely of bringing in collateral issues and collateral evidences of crimes not in any way connected with the crime charged, which would prejudice the defendant, and require him to meet charges which he had had no opportunity to prepare to meet. It was also

urged that the state had shown by its proof and by the opening statement of counsel that the defendant, in firing the shot which killed Emma Kirckel, had done so in necessary self-defense. The court sustained the objection and then refused to permit the witness to answer the question: "Did you have a conversation with the defendant with regard to his relations with Emma, in December, 1925?" Whereupon Mr. Rowan, of counsel for the state, said: "I take it the court will not permit any of the relations to be shown," to which the court replied: "Not along the line offered. If there are any others of bodily injury or anything of that sort, they will be admissible but not as to the two matters that have been mentioned, that is, the two offenses, the statutory offenses."

In these rulings the court erred but the error was in favor of the defendant and at his instance. The rule stated by Mr. Wharton in his work on Criminal Evidence, section 895, is that "when proof has been made of the *corpus delicti* in a homicide prosecution, all facts and circumstances that tend to show motive on the part of the accused are relevant, and equally relevant are the relations between the accused and the deceased, and all feeling that existed between them." The text is supported by a multitude of authority. Upon a trial for murder facts and circumstances are relevant to show that the motive for the homicide was the concealment of a prior crime committed by the defendant, of which the deceased had knowledge. (Wharton, Crim. Evid., sec. 899.) Mr. Wigmore, in section 390 of his great work on Evidence, observes that the circumstances which might excite a desire to kill are innumerable. "The expediency of preventing the discovery of a former crime or of evading an arrest or a prosecution for it, may lead to the desire to kill." "It is relevant to inquire into all of the personal relations between the accused and the deceased as to whether or not the same are a burden upon, or oppressive to, or an obstacle in the way of, one or the other." (Wharton, Crim. Evid., sec. 901.)

In every criminal trial it is competent for the prosecution to prove both an intent and a motive (*People* v. *Martin*, 50 Cal. App. 71, 194 Pac. 522), and considerable latitude in the proof is always allowed. (*People* v. *Sutherland*, 154 N. Y. 345, 48 N. E. 518.) In the last case cited it is held that on a trial for the murder of a woman by a man, proof of meretricious relations between them and of the facts leading up to such relations is competent where it tends to show a motive for the act.

*Miller* v. *State*, 90 Okl. Cr. 255, 131 Pac. 717, was a case in which a man was on trial for the murder of a girl. It was held competent for the state to show all the relations existing between the deceased and the defendant, and that the defendant had entertained illicit sexual relations with the deceased by which the deceased had become pregnant, and that the defendant had attempted ·to have an abortion performed upon the deceased, and that the defendant, being a married man, had become estranged from his wife. "Upon a trial for murder, the motive, or want of motive, upon the part of the defendant for the commission of the crime is always a material question to be considered by the jury." (And see *People* v. *Kline*, 54 Iowa, 183, 6 N. W. 184; *Jackson* v. *Commonwealth*, 100 Ky. 239, 38 S. W. 422.)

What is the situation here? The state offered to show that the defendant, a married man, forty-four years old, had been carrying on sexual relations with a girl seventeen years of age; that he had got her with child and had brought about an abortion to destroy the fruit of his amour. If this be true he was guilty of the crime of rape, for which, upon being found guilty, he might have been sentenced to imprisonment for not less than two nor more than ninety-nine years. And as a principal in the abortion he was guilty of a felony. The offered testimony tended to show that he was in deep trouble over his relations with the girl, and it is clear from the testimony which was admitted that a serious break in their relations, whatever those relations were, had occurred before the

[79 Mont. 343.]

transactions between the parties on March 25, 1926, ended in the girl's death.

He would be a poor judge of human nature who would say that a situation like this, if it existed, was not ripe with mischief, or that it was not sufficient to impel an emotion which might result in murder. The defendant, if the offered evidence be true, was guilty of rape, abortion too, and liable to prosecution. If Emma Kirckel were not living he would have little fear of prosecution for these crimes. She therefore was an obstacle in his way, a menace to his happiness, a constant threat to his liberty. Furthermore, it is common knowledge that the emotions engendered by illicit love have manifested themselves in violence, often to the extent of taking human life, throughout recorded history.

What, then, was the motive of the defendant when he fired the fatal shot? In order to determine that question the tribunal sitting in judgment was entitled to know, so far as evidence was available, all the facts and circumstances tending to throw light upon the acts of the parties, and their relations and feelings toward each other. (*State* v. *O'Brien,* 18 Mont. 1, 43 Pac. 1091, 44 Pac. 399; *State* v. *Felker,* 27 Mont. 451, 71 Pac. 668.)

But it is argued that proof of the other crimes alleged to [2] have been committed by defendant was not admissible. The general rule is that evidence of crimes other than the one for which a defendant is on trial is not admissible, but to this rule there are exceptions, and one is where evidence is material as tending to show the intent or motive of the defendant in the commission of the offense for which he is on trial, notwithstanding the fact that it also tends to prove the commission by him of another offense. (*People* v. *Hendrix,* 192 Cal. 441, 221 Pac. 349; *People* v. *Martin,* supra; *Lawrence* v. *State* (Ariz.), 240 Pac. 863; *Miller* v. *State,* supra; and see *State* v. *Geddes,* 22 Mont. 68, 89, 55 Pac. 919.)

The last argument of counsel for defendant on this feature [3] of the case seems to be that because the defendant ad-

mitted the killing, which he claims was in self-defense, the, state was not permitted to introduce proof of motive, and they rely upon *People* v. *Wright,* 144 Cal. 161, 77 Pac. 877, which followed *People* v. *Gress,* 107 Cal. 461, 40 Pac. 752. *People* v. *Gress* "seems erroneous" in the language of Mr. Wigmore (note to sec. 390, supra), and upon that point the case is expressly discredited in *People* v. *Cook,* 148 Cal. 334, 83 Pac. 43. While *People* v. *Wright* is mentioned in the opinion in *People* v. *Cook,* it is not condemned, and probably for the reason that unquestionably it was correctly decided upon the facts, which are different from those in the case at bar. In *People* v. *Cook,* the court having under consideration a point similar to the one before us, declared it to be untenable (page 340), and further on (page 344) declared that the court in *People* v. *Gress* had not given due consideration to "the fact that in cases of homicide the presence or absence of motive to kill is always material, whether the killing is admitted or denied, not only in determining the degree of murder, if murder, but also upon the question of malice, where the plea is self-defense, as in this case, or provocation and sudden passion." (And see Wigmore on Evidence, sec. 118(4).)

The evidence should have been admitted. But counsel for [4] defendant say their client was prejudiced because in the opening statement he was charged with misconduct with the girl, which must have prejudiced the jury against him, and he was placed in "an unenviable and embarrassing situation" when he could not explain his relations with her. This may be true, but counsel for the state was within his rights in making the statement and the court was right in permitting him to do so. Counsel for the state was within his rights in asking the questions designed to elicit the testimony and the court was wrong in sustaining the objection interposed by defendant's counsel thereto. The defendant will not be heard to complain of the situation which he brought about himself. If the court fell into error through the persuasive eloquence of his counsel, defendant must abide the consequences.

Specification No. 7 is to the effect that the court erred in [5] overruling the defendant's motion to withdraw from the jury the charge of murder in the first degree. As the defendant was not found guilty of murder in the first, but in the second, degree we fail to see how he was prejudiced by the court's ruling. The point is not well taken. (*Territory* v. *Manton,* 7 Mont. 162, 14 Pac. 637; *State* v. *Felker,* supra.)

Specification No. 8 is to the effect that the evidence is insufficient to justify the verdict. We have examined the evidence with great care.

The victim of the tragedy, Emma Kirckel, upon the afternoon of the day she was killed, obtained a 32-caliber [6] automatic pistol from a table drawer in the house of J. J. Lowe, where the Kirckel family was then living, and then went to a store in Fromberg where she purchased a box of cartridges for the pistol. She then proceeded to the Hollowell ranch, arriving there about 5 o'clock. She was well acquainted with the ranch and with those living there. What happened after she reached the ranch we know only from the attendant circumstances and the testimony of the defendant and Anthony Sancomb, an aged man who was cooking and attending to the chores upon the ranch. According to defendant's testimony, when he first saw the girl she was fifteen or sixteen feet distant from him. At the time he was attempting to repair a mowing-machine and was on his knees looking through the drive-shaft housing of the mower. The girl did not approach nearer than twelve feet. After some conversation, during which she appeared in ill humor, defendant said he would have to go to the blacksmith-shop for an iron but would be back in a minute, and started away rapidly. He did not know the girl was following, but coming up behind him she said, "Hollowell, I want that banjo." Considerable conversation on the subject ensued. The banjo belonged to defendant and finally he told her he did not want her to take it. She said: "You will see whether I will take it or not." At this point Sancomb came out upon the porch of the house some distance away.

She said, "Wait a minute, Sanc, I want to ask you something," and "Come over here, Hollowell," and walked rapidly to Sancomb. Instead of heeding her request the defendant picked up the iron he needed and started back to the mowing-machine, whereupon the girl spoke roughly to him saying, "Come over here, I want you to hear this." As the defendant stepped toward her, she said, "Sanc, didn't you tell me Hollowell told you he didn't like me?" And Sancomb replied, "No, I told you I thought he loved you." At this the defendant went to the mower and began working upon it. The girl and Sancomb continued their conversation, but in a short time walked slowly toward the mowing-machine, the girl stopping about twelve feet from the machine and Sancomb a few feet to her left. The girl then accused the defendant of having made statements to Sancomb derogatory to her character. When Sancomb denied that defendant had done so the girl turned to defendant and inquired, "How in hell does he know it?" to which the defendant replied, "I guess Jim knows; I guess your mother and Jack Gee knows; and Sam Gee knows it. I guess someone else could have told him. Anyhow I didn't." Sancomb then left and the conversation between the girl and the defendant continued. She accused the defendant of having told someone in Bridger that she had been intimate with twenty-two different men. The defendant offered to go to Bridger, face her informant, and deny it. After further talk the defendant said, "You told me you had been with three different men last summer and you are supposed to have admitted that to Sam, and he, later, told me. I told them I had spoken to nobody, recently, at Bridger about it. You admit it and you come here and try to raise a row." The girl replied, "I am going to raise more than a row." The defendant then, according to his testimony, got upon his knees again and resumed work about the mower, while the girl stood there "five or six or seven minutes." Then, calling him a name, she told him to get up or she would kill him, saying she had a gun to do it with. She was then twelve or fourteen feet from the defendant. With the gun in her hand she ordered him to get

into the house or she would shoot. Defendant walked ahead
of her. Having a hammer in his hand he went in the direc-
tion of the blacksmith-shop with the intention of leaving it
there; he said the girl knew his custom of putting his tools
where he could find them, but his real purpose was to get
away from her. However, she told him to throw the hammer
down, which he did. They were then twenty-five or thirty
feet from the door of the house, and at this point they met
Sancomb coming to meet them. The girl told Sancomb to go
into the house or she would shoot, and he obeyed. The defend-
ant walked past Sancomb rapidly, entering the house some dis-
tance ahead of him.

The house was of concrete, with a screened-in porch. The
defendant went through the porch, the kitchen and through
a bedroom to a closet where he kept three guns, all of which
were loaded. He seized the double-barreled shotgun, returned
through the two rooms and on to the porch, arriving there
just as Sancomb was coming through the screen door. The
girl was standing on the ground holding the screen door open
with her left hand, with her pistol in her right. The defend-
ant, so he testified, held the shotgun between his arm and his
right side, with the safety-catch on; he never did place the
butt of the gun against his shoulder. As he came to the
kitchen door he directed Sancomb to take the gun away from
the girl, saying, "She is not going to shoot you," and as San-
comb attempted to do so the girl told him to get into the house
or she would kill him. She then said to the defendant, "You
put that gun down; you put that gun down, and I will throw
this one down," but the defendant did not do so. She did not
again ask him to put the gun down. According to the de-
fendant's testimony the two faced each other for fully ten
minutes, and during that entire time he was begging her to
put the gun down. He did most of the talking. She spoke
in monosyllables or in short sentences. At one time, he thought,
she showed signs of relaxing, as she appeared to be getting .
tired and the pistol was pointed at his feet; he said to her,

"Emma, please put that gun down, that isn't anything to be playing with," and she said, "Maybe you think this ain't loaded," and fired (undoubtedly in the air). She always had her finger on the trigger. He continued to beg her to put the gun down but she said she came there to kill him and she was going to do it. When she said that she put her left foot on the step which blocked the screen door, and at that the defendant released the safety on the shotgun and told her not to shoot the gun again—not to pull the trigger, to which she replied that she was going to kill him. Then he fired. The gun was under his arm when he shot. He intended to shoot at her hand or a little to the left of it with the idea of shooting the gun out of her hand. The shot struck the girl in the right side of the neck. The main charge severed the jugular vein, the carotid artery, and the vagus nerve. Death was practically instantaneous. The principal wound was about three inches above the collar-bone. There were shots in the chin, one immediately under the left eye and two above the collar-bone on the left side. There were no wounds upon the arms or hands. After the girl had fallen to the ground the defendant knelt over her saying, "Emma, are you hurt? I will get the car and take you to the doctor right away." The next thing he did was to pick up the pistol which he gave to Sancomb, telling him to hide it. He did not carry the girl into the house, nor place anything under her, but permitted her to lie upon the ground where she fell. The body remained there while defendant and Sancomb prepared to go to Bridger. It was now about dark. After the automobile was made ready they put the girl in the car seat between them, and drove to Bridger, a distance of eight miles. Both testified that they did not know the girl was dead.

The defendant, after having conveyed the body of the girl to Bridger and called a surgeon, telephoned the sheriff at Red Lodge, saying, "We had a little trouble out at the ranch this evening," the Kirckel girl "came out there with a revolver and ordered me and Sancomb in the house, and she shot at

me, and I shot, trying to shoot the gun out of her hand, and incidentally shot her in the neck and hurt her.'' He did not know how badly she was hurt, the doctor was then examining her. (When the surgeon first saw the girl in the automobile at Bridger her body was cold.) The sheriff directed the defendant to proceed to Red Lodge immediately but instead he went to his ranch,—he said for the purpose of getting the pistol for use in evidence.

The defendant's testimony respecting what took place from the time the girl arrived until he fired the fatal shot is somewhat lengthy. We have given but a sketch of it. The testimony of Sancomb generally corroborated that of defendant, but he was contradicted in many important particulars. For instance, witnesses testified that, prior to the trial, Sancomb had told them that when the defendant fired the shot he placed the butt of the gun against his shoulder and aimed at the girl. It is clear from the record that Sancomb intended to shield the defendant to the utmost.

The next day several persons went to the Hollowell ranch and examined the premises. They found evidences of the tragedy. Where the girl fell was plain from the pool of blood. About fourteen feet from the screen door and to the right they found an empty shell from the pistol. Loaded pistol shells were from three to ten feet from the screen door to the left, some in the box and some upon the ground. Two witnesses examined the mowing-machine and the ground thereabout carefully. According to their testimony there was old snow under the mowing-machine which had not been disturbed and there were no foot tracks within a radius of twelve feet of the mowing-machine, and there was no evidence that any work had been done upon the mower recently.

It would be impossible to determine from the dead record whether the defendant was actually in danger from the girl or whether he thought he was. If she went to the ranch with the intention of killing him she had ample opportunity to carry her purpose into effect long before he armed himself with the

shotgun, after which she was as much in peril as was he. It is clear that her act in firing the pistol was one of sheer bravado. It is not at all clear that she was not bluffing throughout. This appears to have been the jury's view; it is quite certain the jury was of the opinion that the defendant fired the shot in malice, with the intention of killing his victim. Was the defendant in actual danger? Did he, as a reasonable man, believe he was in actual danger? Did he really shoot in self-defense? Or did he, with an abandoned and malignant heart, seize the opportunity to take away the life of a fellow creature? The jury adopted the latter view, and we cannot say that it was not fully warranted in so doing. There is an indefinable something running through defendant's testimony which continually raises doubts as to his truthfulness; his story is far from convincing. As between those who sit in judgment, this case presents a striking illustration of how much more advantageous is the situation of the one who sees and hears the witness testify,—who observes the demeanor of the witness upon the stand, with all that implies,—over the one who sits in review with naught before him but cold type. The testimony of the living witnesses, given as it was, must have convinced the jury that the defendant was indeed guilty of murder in the second degree. The jury was entitled to draw the inference that the killing was done in malice from all the facts and circumstances surrounding the tragedy which were disclosed by the evidence, and the failure of the defendant to sustain his plea of self-defense. The court so held in *State* v. *Smith,* 26 N. M. 482, 194 Pac. 869, saying: ''This malice the jury could infer from the evidence or absence of evidence, or it could have been implied in this case as a matter of law if the jury, as an inference of fact, found the essential conditions under the statute for the implication; that is, that no considerable provocation appeared, or that all the circumstances of the killing show a wicked and malignant heart. We are unable to point to any specific evidence, or say that particular evidence is evidence of murder in the second degree,

but the inferences drawn from the facts and circumstances
or the absence of facts and circumstances tending to prove
deliberation justified the jury in taking the view that the
homicide was one with malice, as above defined, and without
deliberation, but with all the other elements of murder pres-
ent.''

As this court said in *State* v. *Byrd*, 41 Mont. 585, 111 Pac.
407, ''unless we can say that the evidence was insufficient to
justify the verdict we have no power to interfere. We cannot
say that. We may not substitute our judgment for that of
the jury.''

It follows that the judgment and order must be affirmed, and
it is so ordered.

*Affirmed.*

ASSOCIATE JUSTICES MYERS, STARK, MATTHEWS and GALEN
concur.