FILED

02/08/2022

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 19-0648

DA 19-0648

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2022 MT 28

STATE OF MONTANA,

    Plaintiff and Appellee,

    v.

ANDREW PIERCE LAKE,

    Defendant and Appellant.

APPEAL FROM:     District Court of the First Judicial District,
                 In and For the County of Lewis and Clark, Cause No. BDC 17-135
                 Honorable Michael F. McMahon, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

        Nick K. Brooke, Smith & Stephens, P.C., Missoula, Montana

        For Appellee:

        Austin Knudsen, Montana Attorney General, C. Mark Fowler, Assistant
        Attorney General, Helena, Montana

        Leo Gallagher, Lewis and Clark County Attorney, Helena, Montana

                                Submitted on Briefs:  August 11, 2021

                                        Decided:  February 8, 2022

Filed:

                        _____
                                    Clerk

¶1    Justice Dirk Sandefur delivered the Opinion of the Court.  Andrew Pierce Lake (Lake) appeals his September 2019 judgment of conviction in the Montana First Judicial District Court, Lewis and Clark County, on the offense of attempted deliberate homicide. We address the following restated issue:

*Whether the District Court erroneously allowed the State to reference and elicit testimony regarding Lake's prior child sex abuse comments and references in an explicit and repetitive manner that was unfairly prejudicial?*

Reversed and remanded.

**FACTUAL AND PROCEDURAL BACKGROUND**

¶2    Late in the evening and into the early morning hours of March 15-16, 2017, Lake and Ryan Zitnik (Zitnik) were among a number of regulars at The Jesters Bar (Jesters) in Helena, Montana.  They had previously known each other from the bar for several years.

1.  Stabbing Attack on Zitnik and Subsequent Arrest of Lake.

¶3    At approximately 1:30 a.m., the two men became involved in a brief altercation near one end of the bar.  Accounts differ as to who instigated it and the extent of their physical contact.  Lake testified at trial that, while walking down the bar in anticipation of "last call," he passed behind Zitnik who was standing at the bar and who "stuck his butt out and bumped [him] really hard."  He testified that he said "[e]xcuse me" to Zitnik and was walking away when he heard Zitnik "yell[] something at [him]."  Lake said that, upon hearing someone else say, "he ain't worth it," he agreed and told Zitnik, "[y]ou hear that Ryan[,] [y]ou are not worth it," and then "walked out [of] the bar."  Zitnik testified at trial

that he could not remember the details of the "light confrontation in the bar" or how it started.

¶4    Kevin Cravens (Cravens), another bar regular and an acquaintance of both men, testified that he saw Lake walk "through from the back side of the bar and start[] exchanging some words," i.e., "start[] the shit-talk," with Zitnik. He said he heard Zitnik respond that he "wasn't even to the bottom of his drink yet and that [Lake] wasn't worth his time." Cravens said that Lake replied that Zitnik was, however, "at the bottom of life," and that Lake then shoved Zitnik in the chest with the palm of his hand before leaving the bar, rambling about and pointing at Zitnik.

¶5    Jesters bartender John Shook (Bartender) testified that he saw Lake do "something to [Zitnik] to get his attention as he walked by," which then set off a brief round of the "standard kind of shit-talking" that often occurred between the two of them. Lake's account at trial varied somewhat, but he testified that the Bartender's account was "[f]airly accurate." The Bartender testified that he "did not think anything would come of" the exchange in the bar. Cravens similarly testified that it was not the "sort of a scene" that appeared likely to result "in a fistfight." The Bartender testified that Zitnik left "a couple minutes" after Lake, and then Cravens left "a minute or so" later.

¶6    Lake testified that, while walking across the street outside the bar, he heard the door open behind him and Zitnik angrily "yelling[,] . . . Andy come here." Lake asserted that he "kept on walking" down the street, but that Zitnik "kept . . . getting closer to [him]" and that, as he continued down the street, he told Zitnik, "leave me alone." He testified that

3

Zitnik was undeterred, however, and kept saying, "[c]ome here," as he continued to get closer. Lake asserted that he kept walking away, but said, "I am warning you . . . [l]eave me alone." He said that Zitnik soon caught up with him, and that only then did he stop and turn to face him. He claimed that Zitnik was facing him in a threatening posture and that he feared Zitnik might attack him with a knife. He claimed that Zitnik then violently grabbed him by the shoulder in a manner that pulled his hooded sweatshirt and underlayers over his head, blinding him. Lake asserted that, while Zitnik "ha[d] ahold of him," he unsheathed his knife from his belt with his free arm and, in self-defense, began swinging blindly, "[r]oundhouse style," at Zitnik until he felt the "knife connect." He recalled swinging at Zitnik "until the last swing when my knife stopped" and Zitnik released him and pushed him to the ground. He asserted that he then "pull[ed] the rest of [his] hoodie" and "other shirts" off and, fearful of the still-standing Zitnik, "got up and . . . ran away," "down the hill," and "walked back home."

¶7    Zitnik recalled that, after "let[ting] [Lake] leave first," he was walking across the street from the bar towards his car when he noticed Lake down the street, a "safe distance" ahead. He testified that he did not remember how they converged, but at some point sensed that he was hurt when he felt the sensation of a "thumbtack going down [his] neck" and realized that Lake was stabbing him. He said that he then grabbed Lake, threw him to the ground, turned away, saw Cravens up the street, and ran towards him.

¶8    Cravens testified that he was walking to his vehicle after leaving the bar when he heard grunting sounds down the street indicative of a scuffle. He said he continued in that

4

direction until he saw Zitnik and Lake emerge from the darkness under a streetlight, with Lake "throwing hooks" at Zitnik, "the last one hit[ting] [him] in the neck." He said that, upon realizing that Zitnik was hurt, he called 911 and then helped Zitnik back to the bar where another regular applied towels to control his bleeding while they waited for an ambulance. An ambulance soon arrived and took Zitnik to the hospital emergency room. Due to the large arterial wound in his neck, attending medical personnel had Zitnik transported to a Great Falls hospital for surgical treatment of his multiple stab wounds.

¶9 Police arrested Lake shortly after the stabbing and interrogated him in custody. On April 3, 2017, the State charged Lake with attempted deliberate homicide based on the stabbing of Zitnik, and evidence tampering based on his alleged concealment or disposal of the knife after the stabbing.[1]

2. Motion to Exclude Prior Child Sex Abuse Comments and References.

¶10 Prior to trial, Lake gave notice of intent to assert the affirmative defense of justifiable use of force (JUOF). On the asserted grounds of relevance and prejudice, he also filed a motion for exclusion of any reference at trial to "an alleged rumor" that he was a "pervert" or "child molester." At the subsequent motions hearing, the parties and the court construed the motion to apply to any and all explicit references to Lake's self-given nickname, various other comments, and a particular dream, all of which referred to forms of child sexual abuse.

---

[1] The State also charged Lake with misdemeanor possession of marijuana and drug paraphernalia after subsequently finding a small quantity of marijuana and a glass pipe incident to a warrant-authorized search of his apartment. He pled guilty to those charges before trial.

¶11    The evidentiary dispute arose from Lake's initial post-arrest statements to police. He initially told detectives that, except for running away with his shirt off without knowing why, he had no memory of the altercation outside the bar. However, when police later followed up on his earlier written statement, Lake told them that an unidentified man, who had previously antagonized and slandered him to other bar regulars "about some" unspecified "things [he] said," followed him outside the bar the night of the stabbing.[2] He explained to police that he often made provocative statements to shock and repel others. For example, he said he was known by the nickname, "skull fucker," had once sang a song in the bar about "skull fucking" and "scallywags," and had told an offensive joke that referred to a "black and blue" "five-year-old boy" in the trunk of his car who "hates sex." After speaking with Lake, police questioned Zitnik in the hospital. He acknowledged that he was concerned about Lake's prior child sexual abuse comments, thereafter did not want to be around him, and had discussed his concerns about Lake with other bar regulars.

¶12    At the subsequent motions hearing, defense counsel acknowledged that the generic facts that Zitnik was offended by Lake's prior child sex abuse comments and references, and had discussed his resulting concerns about Lake with others, were relevant as proof of Lake's alleged motive for attempting to kill Zitnik. Counsel asserted, however, that explicit reference to Lake's "skull fucker" nickname and comments, reference to him as a child molester, and other references to "child molestation" were unfairly prejudicial due to

---

[2] Lake did not identify the referenced "man" in his statements to police, but later admitted at trial that he knew that the "man" was Zitnik, who he had known for years from the bar.

"the risk of . . . convict[ing] [him] for the wrong reasons." Counsel asserted that the State could more generically present evidence of the existence and nature of Lake's animosity toward Zitnik without such explicit child sex abuse references.[3]

¶13 The State countered that verbatim references to Lake's sexually explicit nickname and corresponding child sex abuse comments were relevant to show the serious nature and degree of his animosity toward Zitnik, and thus his motive to attempt to kill him, to wit:

> [*T*]*here is something unique about somebody who himself says that he is a child molester*. . . . [H]e said that he was a skull fucker. He said that he had this bad joke about a dead five-year-old in his trunk who didn't like sex. *These statements* and ones like [them] were made to [Zitnik] and . . . other people in the bar . . . [and] *caused heightened concern by everybody* in the bar about whether [Lake] was violent, whether [he] was somebody who [they] should keep children away from . . . [a]nd just saying [it more generically will] not adequately explain why [Lake] would want to kill a man who had warned others *about his sexual abuse*. So I don't know how we . . . amp it down. . . . [It is] the only reason that anybody can understand why these men were engaged in a knife attack on the street. . . . [Lake] said it[,] . . . [Zitnik] heard it[,] [a]nd the *man who helped* . . . bring [Zitnik] back to the bar after the knife attack . . . will testify . . . that *he* was [thus] *concerned* . . . *that he was also in jeopardy* as he helped rescue [Zitnik] because there is nothing like somebody coming in and talking about dead children and molesting them.
>
> [I]t is prejudicial[,] . . . but it's not unfair because it goes to the heart of what this dispute was about. . . . The State does not intend to prove that he did, in fact, molest children. He just told people that he had this dream, that he was called "skull fucker[,]" . . . and that he had this notion of skull fucking a child's skull . . . [and] the victim warned other patrons in the bar, "[k]eep your children away from him." . . . [T]hat "slander" is . . . why this man may have followed him out of the bar and this altercation took place.

---

[3] Lake's counsel suggested at hearing that the State and its witnesses could less prejudicially refer to his child sex abuse comments and references as "slurs."

(Emphasis added.) Based on the State's asserted motive theory, the District Court denied

Lake's motion in limine without qualification, except for ruling that references to his child

sex abuse comments would be subject to a limiting instruction informing the jury of their

limited purpose as proof of his alleged motive for attacking Zitnik.[4]

3. Trial References to Prior Child Sex Abuse Comments and References.

¶14     Jury trial commenced on April 9, 2018.  Before opening statements, the District

Court instructed the jury, *inter alia*, that:

> You will hear evidence that the defendant made shocking statements about
> child sex abuse.  The only purpose of admitting that evidence is to show proof
> of motive.  That evidence will not be admitted to prove the defendant actually
> sexually abused a child or to establish his character or to show he acted in
> conformity therewith.  You may not use that evidence for any other purpose
> other than to determine motive.  The defendant is not being tried for making
> these shocking statements.  You will not hear any evidence that the defendant
> actually sexually abused a child.

In its opening statement, the State previewed the disputed evidence to the jury:

> So at this point, you are probably wondering . . . [w]hy did [Lake] attack
> [Zitnik]? . . . [Y]ou will hear . . . that . . . [Lake] made a remark to [Zitnik],
> making a joke or some sort of comment about child sex abuse. . . . [T]he
> judge read you the instruction . . . that this trial is not about whether . . .
> [Lake] actually sexually abused a child.  There is no evidence to show that;
> that's not what this is about.  But what you will hear is that he, for whatever
> reason, made provocative and shocking comments to people about child sex
> abuse and so when he made such a comment to . . . [Zitnik], who has children,
> [he] was offended[,] . . . did not like that and [was] concerned [about] him[,]
> . . . so he . . . tr[ied] to let people who had kids that hung out there or maybe

---

[4] The State did not explain how Lake's alleged affinity for child sex abuse could reasonably cause
Zitnik or other bar regulars to be concerned that he "was [potentially] violent" towards them.  Ditto
as to the "concern" of "everybody in the bar" as to whether Lake was "somebody who [they]
should keep children away from," and the concern of the "man who helped" Zitnik that he, apart
from Zitnik, "was also in jeopardy."

worked there [know] that they should be careful of having their kids around [Lake].

You will also hear that this was a pretty common thing for [Lake] to do. He also made a similar comment to . . . Cravens . . . [and also] told [Cravens] and another . . . about having a dream about raping a 14-year-old girl . . . [and that Cravens then] no longer wanted to be friends with him. . . . So again, this trial isn't about child sex abuse but you are going to hear evidence that the defendant liked to shock people by talking about it.

In its case-in-chief, and on cross-examination of defense witnesses, the State thereafter repeatedly referenced and elicited testimony from multiple witnesses that: (1) Lake referred to himself as "skull fucker"; (2) the name and term referred to "fucking" the skull of a child; (3) Lake's "skull fucker" nickname and references were well known to regulars at the bar; (4) Lake previously made a comment directly to Zitnik about "fucking" a child's skull which offended Zitnik and in regard to which he discussed his resulting concerns about Lake with others in the bar; (5) Lake sang a song in the bar about "skull fucking"; (6) Lake repeatedly yelled out "skull fucker" in the bar; (7) Lake told a joke at the bar about a child in the trunk of his car who didn't like sex; (8) Lake previously disclosed to Cravens and another that he had a dream about raping a 14-year-old girl which then offended Cravens and caused him to dislike Lake; and (9) Cravens discussed Lake's child rape dream with other regulars, including Zitnik, which then furthered poisoned Zitnik against Lake.

A. Cravens Testimony.

¶15    Cravens was the only known eyewitness to what occurred outside the bar. During its case-in-chief, the State questioned him, *inter alia*, about his prior relationship with Lake

9

in the months leading up to the stabbing.[5] He testified that, a few months before, Lake "came outside around the back [of the bar] and made a comment about having a dream about raping a 14-year-old girl." Cravens, whose "daughter was 14 at the time," found the story "hurt[ful]" and "offensive" and no longer "want[ed] to be [Lake's] friend."[6] The State asked whether Lake "demonstrate[d] anything to illustrate his dream." Cravens answered that he "made a motion as he was saying it." The State asked, "[a]s if he was engaged in intercourse?" Cravens replied, "[s]omething like that," and that he found it offensive and had thus discussed it with other bar regulars including Zitnik who also found it offensive. The following colloquy then occurred on defense cross-examination:

> [Defense]: [Y]ou never heard [Zitnik] say mean things to [Lake]?
>
> . . .
>
> [Cravens]: Directly to him, no.
>
> . . .
>
> [Defense]: "You are a pervert. You are a child molester." [D]id you hear [Zitnik say] any of those [to Lake]?
>
> [Cravens]: I had heard things like that but I never heard . . . that happen.

---

[5] Upon receipt of a State witness subpoena, Cravens initially refused to testify, purportedly due to safety concerns. On the State's motion on the first day of trial, the District Court issued a warrant for Cravens' arrest based on "civil contempt." Upon his arrest, the State deposed Cravens in open court after voir dire, outside the presence of the jury. The next morning, the State called Cravens to testify at trial, which he did without objection or incident.

[6] Cravens further stated that, while he and others were "concerned about" Lake, "the consensus" in the bar "was that [Lake] was harmless."

10

[Defense]:   Okay[,] . . . you had heard things[,] correct?  There was quite a rumor going around the bar . . . [a]s to [Lake] . . . being a child molester or pervert?

[Cravens]:   Yes, for years.

. . .

[Defense]:   Did you say things to [Lake] . . . like[,] "You are a child molester. You are a pervert."  [T]hose kind of things?

[Cravens]:   There was an inciden[t] one night at the bar that [Lake] kept rubbing against me . . . [after] I had already told [him] to stay away from me and . . . [when] the same thing . . . [happened again] I pushed him off of me and I did say, "Get off of me you cho mo."[7]

After defense counsel asked whether Cravens had ever previously stated that Lake's description of the child rape dream included a sexual "motion," the State, on redirect, made and elicited additional explicit references to Lake's child sex abuse statements, to wit:

[State]:   And so you [previously stated to police], ". . . [Lake] admitted . . . he's known . . . [by the nickname] skull fucker . . . [and] has [also] made a comment about . . . skull fucking a young kid . . . [and said that] 'I had this dream last night [that] I was raping this fucking 14-year-old girl['] . . . and he is going like this[.]" . . . So when you said, "[Lake] is going like this," were you making the gyrating motion for the cop?

[Cravens]:   Yeah.

. . .

[State]:   And now yesterday when you gave your [deposition] statement . . . you [said], ". . . [Lake] walked up and . . . said that . . . 'I had a dream last night that I was raping this . . . 14-year-old redhead.'["] . . . Then the question was, "You are demonstrating how he – ," and your answer was, "Made a humping motion."

[Cravens]:   Yes.

---

[7] The record indicates that "cho mo" was a shorthand/slang for "child molester."

11

B.  Bartender Testimony.

¶16    On direct, the State questioned the Bartender, *inter alia*, about what happened before Lake and Zitnik left the bar and as to his knowledge of their prior relationship.  He testified that he did not really know why, but that Lake and Zitnik did not like each other and that he had previously heard them speak "crassly" to each other and engage in "shit-talk."  He initially testified that he had previously heard Cravens *and* Zitnik refer to Lake as a child molester, but later clarified on redirect that it was actually Cravens who had referred to him as a child molester, not Zitnik.  The State asked the Bartender whether Cravens and Lake had been "friendly or unfriendly" before he heard Cravens refer to Lake as a child molester. He responded that they had been "pretty friendly up until the story."  The State asked him to specify what "the story" was about.  He replied that he recalled Cravens saying that it was "something about [Lake] having a dream about having sex with a 14-year-old."  The State then asked again whether it was Cravens who "told [him] about the dream" and his "child molester concern."  The Bartender affirmed his earlier testimony, said that he never heard Zitnik talk about it, and assumed he heard it from Cravens.

C.  Detective Lawrence Testimony.

¶17    The State presented the testimony of police detective Chad Lawrence regarding his follow-up post-arrest questioning of Lake regarding his earlier written statement to police.

Detective Lawrence testified that he was trying to get Lake to clarify his written statement "about being slandered by" Zitnik, to wit:

[State]: And so did you . . . [ask] him what he meant by the term "slandered"[?]

[Detective]: Yeah. . . . [H]e said that [he and Zitnik] . . . [knew] each other [as] semi-friends at one point and that he believed that Mr. Zitnik had told other people things that he had told him.

[State]: And so did you get into specifics about the slander part?

[Detective]: Yeah. . . . [H]e brought up that he likes to say things to shock other people . . . [and] he gave us an example of, "What's black and blue and hates sex?" [We] did not respond and he said, "[t]he five-year-old boy in my trunk." . . . He said he would say things like that that would cause shock in others . . . [a]nd . . . he said he was nicknamed "skull fucker."

[State]: And did he tell you how that caused the other man . . . to react toward him?

[Detective]: [Lake] said that *he was telling other people . . . about his sexual desires* or something to that effect *with children* and this man told the other people . . . about that stuff and there was some animosity between them. [(Emphasis added.)]

D. Zitnik Testimony.

¶18    The State elicited testimony from Zitnik, *inter alia*, regarding his prior relationship with Lake. Zitnik testified that it was "pretty hard to narrow down" what led to their falling out approximately a year before the stabbing, but conceded there were "definitely some issues" and that he "didn't want to listen to [Lake] talk about some things." The State then pressed Zitnik for more:

[State]: [I]f I could get a little bit more specific, . . . what things did you not want to hear him talk about?

13

[Zitnik]:    . . . I don't remember exactly word-for-word[.] . . . [He] called himself a skull fucker [and] . . . he was talking about skull fucking . . . children because their skulls are softer and more like rubber[.] . . . I told him that I'm not going to put up with it and stay away from me after that.

When asked on cross-examination how long he had been telling Lake, "I don't like you[,] [s]tay away from me," Zitnik responded, "Since he told me he likes to fuck children in the skull." In response to a follow-up question as to why he could not remember when Lake made such statement, Zitnik replied, "because it's . . . a flake of dust in the wind[,] [i]t means nothing to me." Contrary to Cravens' testimony, and the State's assertions at the pretrial motions hearing and in its opening statement, Zitnik did not testify that he had children or that Lake's child sex abuse comments and references offended him because he did.

E. Lake Testimony.

¶19    After the State rested its case-in-chief, Lake testified as to his account of the stabbing and preceding events. He admitted stabbing Zitnik, but asserted that he was trying "to defend [him]self" rather than "try[ing] to kill him." Lake testified that Zitnik began "getting hostile" toward him in the last three months prior to the stabbing, called him "sick" and "disgusting," and threatened to "slice [his] throat." Lake stated that he stopped going into Jesters whenever he thought Zitnik was there.[8]

---

[8] Lake testified that he could tell if Zitnik was at the bar because he knew where Zitnik's "regular [parking] spot" was.

14

¶20   On cross-examination by the State, Lake acknowledged that he told police that

Zitnik had "blatantly slandered" him after becoming "upset about some of the things [he]

said."  The State then pressed for more detail:

[State]:      Did you tell somebody that your nickname in the military was "skull fucker"?

[Lake]:      No.

[State]:      [D]id you make comments that were shocking to people about children?

[Lake]:      Yes.

[State]:      So could you explain why you would tell people in a bar over the course of months or years shocking things about molesting children?

[Lake]:      Sometimes it would make people laugh.  Other times it would get people away from me.

[State]:      . . . [D]id you tell [Cravens] shocking things about your attitude about children . . . about the dream that you had?

[Lake]:      Yes, I [did].

[State]:      And do you recall saying the age of the child involved in that dream?

[Lake]:      Yes, I do.

            . . .

[State]:      Was there some precipitating event that caused [Cravens] to tell you to stay away from him . . . [and] [s]o why did he start referring to you in the presence of others as a child molester?

[Lake]:      Because he didn't like me.

[State]:      And you gave him no reason to believe that [the] apparition of being a child molester was something that would allow him to refer to you in that way?

15

[Lake]:     I don't know. . . . I had made a joke like that around him before . . . and he didn't have a problem with it.

            . . .

[State]:    [S]o you are [saying] you did not tell [Cravens] about a dream that you had involving a 14-year-old being molested?

[Lake]:     That was a nightmare first off.

[State]:    Did you tell [Cravens] about it?

[Lake]:     Yes, I did.

            . . .

[State]:    Did you ever say shocking things to people other than Mr. Cravens or Mr. Zitnik . . . [and] [w]hat did you tell them?

[Lake]:     I would yell thinks like "skull fucking" . . . things . . . of that nature. Sometimes I would make a joke.

[State]:    About the boy that was dead in the trunk of your car?

[Lake]:     I didn't say [the] "boy was dead." I was merely repeating a joke my co-worker told me.

[State]:    . . . What was the joke?

[Lake]:     I'd rather not say.

[State]:    Well, I'm asking you what was the joke?

[Lake]:     My co-worker . . . asked me what was black and blue and hated sex. I said, "What?" He said, "The boy in the back of my truck."

[State]:    And was that an offensive joke to some in the bar?

[Lake]:     Yes.

[State]:    Was it . . . offens[ive] . . . to Mr. Zitnik?

16

[Lake]:      I believe so.

             . . .

[State]:     [W]hy would you . . . yell[] out "skull fucker," why – did you tell the
             cops something about a scallywag song?  Remember that? . . . What's
             the scallywag song about?

[Lake]:      [I]t was about skull fucking.

[State]:     Skulling?

[Lake]:      Skull fucking.

             . . .

[State]:     You talked [in the bar] about the nightmare you had involving a
             14-year-old being hurt sexually?

[Lake]:      Yes.

[State]:     You sang a song about skull fucking that was heard by others . . . in
             the bar . . . [a]nd you used the term "skull fucker" more than once in
             that bar, didn't you?

[Lake]:      Yes.

             . . .

[State]:     Why do you keep saying those things about children?

[Lake]:      . . . Sometimes I make jokes and they are funny but sometimes I just
             want people, certain people, to get away from me.

F.  Chadwick Testimony.

¶21    Lake called Jesse Chadwick (Chadwick) to testify on his behalf.  Chadwick was a

childhood friend and Army buddy who served with Lake in Afghanistan.  He testified that

prior to the stabbing incident, Lake voiced concerns that "he would be jumped" due to bar

17

regulars "persecuting him" for "open[ing] up about a dream that he had." He testified that it was his "impression" that Lake was "looking for . . . a way to walk away . . . without having to fight" and that he sought Chadwick's advice on how to "peacefully" resolve the "conflict" with Zitnik. Defense counsel then asked Chadwick, "What's your opinion of . . . [Lake's] veracity for truth [and] . . . honesty[?]" to which he replied, "100 percent . . . [u]nequivocally." On cross-examination, non-sequitur to his prior testimony regarding Lake's character for truthfulness, the State extensively questioned Chadwick about his knowledge of Lake's comments to others about child sexual abuse, and whether *he thought* their adverse reactions were reasonable:

[State]:    So [Lake] told you that he was having problems with some people at Jesters, right? . . . And he had opened up about a dream that he had, correct?

[Chadwick]: Correct.

[State]:    Did he tell you that when he related this dream to a couple of people at Jesters that he made the motion like that he was having sex with someone, with this 14-year-old that he had the dream about? Were you aware of that?

[Chadwick]: No, he didn't.

[State]:    Were you aware that he would yell the term . . . "skull fucker" in the bar and just randomly yell that out?

[Chadwick]: . . . We had talked about it at one point, yes, but that's the only exposure I have ever had to that.

[State]:    Did he tell you that he had a joke that he would tell about a five-year-old in the trunk of a car?

[Chadwick]: I did not hear that, no.

18

[State]:        And so does it make sense to you that people might have concerns if somebody is sharing this information that's making light of and maybe even boasting about sexual abuse of children?

[Chadwick]:   I am kind of the king of off-color jokes myself and I mean I see the line a little clearer than he does is the . . . way that I see it.

[State]:        Okay.  Let me tell you what the joke was, all right?

[Chadwick]:   Okay.

[State]:        And I guess the jury can decide whether they think it's off-color or something beyond that.  The joke was – and he told this to the police after he was detained – "What's black and blue and doesn't like sex?"  [A]nd the answer is, "The five-year-old in my trunk."  That seems to be a little bit beyond off-color; wouldn't you agree with that?

[Chadwick]:   I have heard that [joke] from other people before.

[State]:        . . . So Mr. Lake's testimony yesterday was that some people thought it was funny and some people didn't.  So do you know a lot of people who think that joke is funny?

[Chadwick]:   I know a lot of people who would laugh at that joke, yes, I do.

                . . .

[State]:        [D]o you think it's reasonable that people at Jesters were not just concerned about [Lake's child rape] dream . . . and the way he related it but also his comments about being a skull fucker and the jokes and that sort of thing?

[Chadwick]:   Probably was not being his best advocate, no.

[State]:        . . . Do you think it would be reasonable for a person that had a 14-year-old daughter to be offended about a person telling them about a dream that they had had—

[Defense]:     Objection.  Speculation and not relevant.

                . . .

19

[Court]:        Overruled.

[State]:        Do you think it would be reasonable or unreasonable for somebody who had a 14-year-old daughter to be offended by that?

[Chadwick]:  I think it would be reasonable.

4.  Final Limiting Instruction and Verdict.

¶22    Based on its stated concern that "[t]here ha[d] been a lot of talk over [Lake's] perverse statements, a lot of testimony about it," the District Court included in its final jury instruction set, *inter alia*, the preliminary jury instruction given earlier regarding the limited scope of admissibility of the multitude of trial references to Lake's child sex abuse comments and references.  Upon deliberation, the jury returned a verdict finding Lake guilty of attempted deliberate homicide, but not guilty of tampering with evidence.  The District Court later sentenced Lake to serve an 80-year prison term with no time suspended, *inter alia*.  Lake timely appeals.

**STANDARD OF REVIEW**

¶23    "District courts have broad discretion to determine the admissibility of evidence in accordance with the Montana Rules of Evidence and related statutory and jurisprudential rules."  *State v. McGhee*, 2021 MT 193, ¶ 10, 405 Mont. 121, 492 P.3d 518; *State v. Cesnik*, 2005 MT 257, ¶ 12, 329 Mont. 63, 122 P.3d 456; *State v. Aakre*, 2002 MT 101, ¶ 8, 309 Mont. 403, 46 P.3d 648.  A trial court's decision on "whether to admit evidence of other crimes, wrongs[,] or acts under M. R. Evid 404(b)" is "directed to the relevance and admissibility of such evidence," and thus reviewed for an abuse of discretion.  *State v. Ayers*, 2003 MT 114, ¶ 25, 315 Mont. 395, 68 P.3d 768 (citing *Aakre*, ¶ 8); *State v. Crider*,

20

2014 MT 139, ¶ 14, 375 Mont. 187, 328 P.3d 612. In this context, an abuse of discretion occurs "when a district court acts arbitrarily without conscientious judgment or exceeds the bounds of reason, resulting in substantial injustice." *State v. Madplume*, 2017 MT 40, ¶ 19, 386 Mont. 368, 390 P.3d 142. To the extent an evidentiary ruling "is based on an interpretation of an evidentiary rule or statute, our review is de novo." *State v. Lacey*, 2010 MT 6, ¶ 12, 355 Mont. 31, 224 P.3d 1247 (citing *State v. Derbyshire*, 2009 MT 27, ¶ 19, 349 Mont. 114, 201 P.3d 811).

**DISCUSSION**

¶24 *Whether the District Court erroneously allowed the State to reference and elicit testimony regarding Lake's prior child sex abuse comments and references in an explicit and repetitive manner that was unfairly prejudicial?*

¶25 "All relevant evidence is admissible" except as otherwise provided by law. M. R. Evid. 402. However, evidence is "relevant" only if "tend[s] to make the existence of [a] fact . . . of consequence to the determination of the action more . . . or less probable." M. R. Evid. 401. In conjunction with the general rule of admissibility under Rules 401-02, M. R. Evid. 404 more specifically governs the admission of character evidence. Character evidence is "evidence regarding a person's general personality traits or propensities, whether of a praiseworthy or blameworthy nature" including, *inter alia*, "evidence of a person's moral standing in a community." *State v. Pelletier*, 2020 MT 249, ¶ 15, 401 Mont. 454, 473 P.3d 991 (quoting EVIDENCE, *Black's Law Dictionary* (11th ed. Westlaw 2019)—internal punctuation omitted). The term "character" is "generally synonymous with morality" and "includes the sum total of all of a person's moral traits, including

21

honesty, fidelity, peacefulness," *inter alia.  Pelletier*, ¶ 15 (quoting *State v. Moorman*, 133 Mont. 148, 155, 321 P.2d 236, 240 (1958)—internal punctuation omitted).[9]

1.  Rule 404(b) Prohibition and Admission of Other Acts Evidence.

¶26    Except as otherwise narrowly provided by an exception to the general rule,[10] evidence regarding the character (including but not limited to evidence of a particular character trait) of a party, witness, or hearsay declarant is not admissible for the purpose of proving that the person acted in "conform[ance] therewith on a particular occasion." M. R. Evid. 404(a).  As a particular application of the general rule of Rule 404(a), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith."  M. R. Evid. 404(b).  The purpose of the general rule of M. R. Evid. 404(b) is to prevent improper "jury inference, based on evidence of other uncharged bad acts or allegations, that an accused is a person of bad character, and thus likely guilty of the charged offense based on common experience or belief that persons of bad character are predisposed or have a tendency or propensity to

---

[9] *Accord* 1A John H. Wigmore, *Evidence* §§ 52 and 55, at 1148 and 1159 (Tillers rev. 1983) (defining character as "the actual moral or psychical disposition or sum of traits," i.e., a "fixed trait or the sum of traits"); Christopher B. Mueller & Laird C. Kirkpatrick, *Evidence* § 4.11, at 182 (4th ed. 2009) ("character is not a unitary concept: . . . [e]veryone has multiple traits of character"); 1 J. Strong, *McCormick on Evidence* § 195, at 825 (4th ed. 1992) (character is "a generalized description of a person's disposition, or of a disposition in respect to a general trait, such as honesty, temperance[,] or peacefulness").

[10] *See Pelletier*, ¶¶ 16-17 (discussing limited Rules 404(a)(1), (3), 608(a), and (b) propensity evidence exceptions to the general rule of Rule 404(a)).

subsequently act in conformance therewith." *McGhee*, ¶ 14 (internal citations omitted).[11]

*Accord State v. Mont. Eighteenth Jud. Dist. Ct.* (*Salvagni*), 2010 MT 263, ¶ 47, 358 Mont. 325, 246 P.3d 415 (Rule 404(b) precludes admission of other acts evidence for a purpose that allows an "inference from bad act to bad person to guilty person"); *Aakre*, ¶ 12 (the intent of the Rule "is to prevent convictions . . . based on a jury finding that [an accused] has a propensity to do certain things"). The "general prohibition" of Rule 404(b) "comes into play whenever the nature of the evidence might tempt the jury to decide the case against the defendant on an improper propensity basis" and thus "applies to any conduct, criminal or noncriminal, that effectively impugns or reflects negatively on the defendant's character." *State v. Stewart*, 2012 MT 317, ¶ 62, 367 Mont. 503, 291 P.3d 1187 (internal citations omitted).

¶27    In contrast, however, Rule 404(b) authorizes admission of other acts evidence when relevant for other non-propensity purposes. *McGhee*, ¶ 15 (quoting M. R. Evid. 404(b) and noting its non-exclusive list of other potentially relevant non-propensity purposes). This "alternative or exception clause" of the Rule "is a contrasting rule of inclusion for admission of other acts evidence that has independent relevance to a material matter at

---

[11] *Accord Pelletier*, ¶ 15 n.6 (general rules of M. R. Evid. 404(a) and (b) are "based on recognition that persons of bad character are in fact more likely to commit crimes than persons of good character" and "the resulting need in our constitutional system to have criminal convictions based on evidence that the accused is in fact guilty of the particulars of the alleged crime without consideration of the unfairly corroborating inference that the person is more likely to be guilty based on his or her bad character traits"—quoting *State v. Gowan*, 2000 MT 277, ¶¶ 19-20, 302 Mont. 127, 13 P.3d 376 (citing *Michelson v. United States*, 335 U.S. 469, 475-76, 69 S. Ct. 213, 218-19 (1948)), and noting various justifications for the general rule—internal punctuation omitted).

issue other than for proof of propensity conformance." *McGhee*, ¶ 15 (quoting *Pelletier*, ¶ 18 (citing *Salvagni*, ¶¶ 47 and 56, and *United States v. Curtin*, 489 F.3d 935, 944 (9th Cir. 2007)), and *Salvagni*, ¶¶ 47 and 62—internal punctuation omitted). It is "a special application of the doctrine of multiple admissibility under which other acts evidence inadmissible for propensity purposes may yet be admissible for a relevant non-propensity purpose." *Pelletier*, ¶ 18 (citing 22B Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice & Procedure: Evidence* § 5243, 132 (West 2017)).[12] Thus, "Rule 404(b) does not categorically bar all other acts evidence"—it bars "only a particular *theory of admissibility*" of the subject evidence. *McGhee*, ¶ 15 (quoting *Salvagni*, ¶ 47 (emphasis original)—internal punctuation omitted). Whether other acts evidence is admissible or inadmissible under Rule 404(b) depends on the particular purpose of the evidence rather than its substance. *Madplume*, ¶ 23 (citing *Salvagni*, ¶¶ 47 and 62-63).[13] However, "[m]ere reference to a permissible purpose is insufficient"—other acts evidence is admissible under the alternative clause of Rule 404(b) "only if the proponent can clearly articulate how" it "fits into a chain of logical inferences, no link of which may be [an] inference that the defendant [thus] ha[d] the propensity" or was predisposed to commit the charged offense. *Madplume*, ¶ 23 (quoting *State v. Clifford*, 2005 MT 219, ¶ 48, 328 Mont. 300, 121 P.3d

---

[12] *See also* M. R. Evid. 105 (in re limiting instructions for evidence admissible for one purpose but not for another).

[13] The related question of whether the predominant *effect* of the other acts evidence is to permit or invite an improper propensity inference is not a threshold "other purpose" issue under Rule 404(b), but rather, a distinct prejudice consideration under M. R. Evid. 403. *Salvagni*, ¶ 62.

489—internal punctuation omitted). *Accord Stewart*, ¶ 61 (citing *Salvagni*, ¶ 47, and quoting 22A Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice & Procedure: Evidence* § 5239, 260 (Thomson Reuters Supp. 2012), and 1 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 4:28, 746-47 (3d ed. 2007)).

¶28     One of the non-propensity "other purpose" exceptions expressly contemplated by Rule 404(b) is admission of other acts evidence for the purpose of proving that an accused had a motive for committing a charged offense.[14]  A "motive" is a reason or rationale for doing or not doing something.  *See* MOTIVE, *Webster's Third New International Dictionary* (Rev. ed. 2002) ("something within a person . . . that incites him to action"— "a prompting force or incitement working on a person to influence volition or action").  *See similarly State v. Blaz*, 2017 MT 164, ¶ 14, 388 Mont. 105, 398 P.3d 247 (motive is a somewhat "nebulous concept" that includes "something . . . that leads someone to act" and is "evidential toward . . . doing or not doing the act"—quoting *Black's Law Dictionary* (Bryan A. Garner ed., 10th ed. 2014)—internal punctuation omitted).[15]  Proof of motive is not necessary for proof of any requisite criminal mental state under current Montana law, see §§ 45-2-101(35), (43), (65), and -103(1), MCA, nor for any other essential element of

---

[14] *See similarly State v. Hollowell*, 79 Mont. 343, 349, 256 P. 380, 382-83 (1927) (stating pre-Rules common law antecedent to Rule 404(b) in re admission of prior acts evidence to prove criminal motive or intent).

[15] In contrast to a motive for acting or not acting, "intent" is a desired aim, purpose, objective, or goal, i.e., "the mental resolution or determination to do" or not do something.  *See* INTENT, *Black's Law Dictionary* (11th ed. 2019).  *See also* INTENT, *Webster's Third New International Dictionary* (Rev. ed. 2002) ("directed with strained or eager attention"—"having the mind or attention closely or fixed directly on something").

25

a crime. *See* Title 45, chapters 4-10, MCA. However, it is the State's burden to prove every essential element, including the requisite mental state, of a charged offense a beyond a reasonable doubt. *State v. Patton*, 183 Mont. 417, 424, 600 P.2d 194, 198 (1979); *In re Winship*, 397 U.S. 358, 359-64, 90 S. Ct. 1068, 1070-73 (1970). *See also* §§ 26-1-402 and -403, MCA (in re evidentiary burdens of proof); § 45-2-103(1), MCA (requiring proof of requisite mental state for all non-absolute liability offenses). Even though not an essential element of proof, the existence or non-existence of a motive to commit a charged offense is generally a relevant consideration in the assessment of whether an accused had the requisite criminal mental state and was in fact the person who committed the alleged offense. *State v. Enright*, 2000 MT 372, ¶ 22, 303 Mont. 457, 16 P.3d 366; *State v. Wells*, 252 Mont. 121, 125, 827 P.2d 801, 803 (1992) (internal citation omitted); *State v. Murdock*, 160 Mont. 95, 103-04, 500 P.2d 387, 391-92 (1972); *State v. Simpson*, 109 Mont. 198, 208-09, 95 P.2d 761, 764-65 (1939); *State v. Fine*, 90 Mont. 311, 314, 2 P.2d 1016, 1017 (1931); *State v. Hollowell*, 79 Mont. 343, 349, 256 P. 380, 382 (1927).[16] The existence of a motive, and the underlying nature and state of the prior relationship between the accused and an alleged victim, is likewise generally relevant to an accused's "state of mind and intent" when JUOF is at issue. *State v. Weinberger*, 204 Mont. 278, 292, 665 P.2d 202, 210 (1983).

---

[16] *See similarly State v. Mills*, 2018 MT 254, ¶¶ 18-19, 393 Mont. 121, 428 P.3d 834 (noting 1973 Criminal Code displacement of prior common law-based offenses requiring proof of "specific and general intent" with Model Penal Code offenses requiring proof of purposely, knowingly, or negligently mental states).

¶29 Accordingly, here, the State had the initial burden of proving that Lake purposely committed an act toward purposely or knowingly causing Zitnik to die. *See* §§ 45-4-103(1), 45-5-102(1)(a), 45-2-101(35), (65), and -103(1), MCA (defining attempt, deliberate homicide, and requisite mental states). *See also State v. Sellner*, 286 Mont. 397, 401, 651 P.2d 996, 998 (1997) (attempted deliberate homicide "requires proof that the defendant had the *purpose* to cause the death of another . . . and *acted* toward purposely or knowingly causing" that person to die—emphasis added); *State v. Ilk*, 2018 MT 186, ¶ 19, 392 Mont. 201, 422 P.3d 1219 (attempted deliberate homicide is "a result-based crime[]" requiring a specific, result-based mental state); *State v. St. Marks*, 2020 MT 170, ¶¶ 20-22, 400 Mont. 334, 467 P.3d 550 (justifiable use of force assertion in attempted deliberate homicide case does not contest and thus effectively concedes State's proof that the accused "acted purposely or knowingly," but does not necessarily preclude an assertion that he or she did so without purpose to cause the victim to die—internal citations omitted). Also at issue here was Lake's asserted JUOF defense and thus, *inter alia*, his state of mind and the reason why he stabbed Zitnik—whether in self-defense or not.

¶30 We have previously recognized at least two motive theories of non-propensity relevance of other acts evidence in a criminal case. *See Salvagni*, ¶ 59. Under the first, the State asserts the prior uncharged act as a reason why the accused committed the charged offense, i.e., that the uncharged act was the cause of the charged criminal act, rather than its effect. *Salvagni*, ¶ 59 (citation omitted). *Accord State v. Sweeney*, 2000 MT 74, ¶ 25, 299 Mont. 111, 999 P.2d 296 (internal citations omitted). *See also, e.g., State v. Ellison*,

2018 MT 252, ¶ 13, 393 Mont. 90, 428 P.3d 826 (evidence of a law enforcement officer's involvement in prior conviction of the accused was relevant to show a "viable motive to retaliate" by "concocting a crime scene . . . to frame" him); *Simpson*, 109 Mont. at 208-09, 95 P.2d at 764-65 (evidence of accused's prior commission of an undiscovered murder relevant to prove his motive to kill inquiring sheriff's deputy); *Hollowell*, 79 Mont. at 348-49, 256 P. at 382 (evidence of accused's prior undiscovered crimes against victim probative of his subsequent motive to kill her).[17] Here, construed in the light most favorable to the State regardless of the errant portions of its stated rationale at the pretrial motions hearing, its asserted Rule 404(b) motive theory was that Lake's prior uncharged child sex abuse comments and references set off a chain of events that ultimately motivated him to attempt to kill Zitnik. More specifically but generically stated, Lake made various child sex abuse comments and references that offended and concerned Zitnik, which then

---

[17] Under the second, the State asserts the uncharged act as additional proof, in conjunction with other proof of the charged offense, to show that the accused committed both acts in furtherance of a common purpose, thus "strengthen[ing] the inference" that he or she committed the charged offense. *Salvagni*, ¶ 59 (citation omitted). In other words, the uncharged act "does not *supply* the motive" for the charged offense, but evinces "*the existence*" of a common motive as the common cause or reason for both, and that the charged and uncharged acts were thus "the effects" of that common motive or purpose. *Salvagni*, ¶ 59 (citation omitted—emphasis original). *See also, e.g.*, *State v. Daffin*, 2017 MT 76, ¶¶ 19-22, 387 Mont. 154, 392 P.3d 150 (prior uncharged sexual abuse of multiple victims and charged SIWC explainable by common motive—accused's ongoing "sexual fixation with underage teen girls, particularly . . . in vulnerable family situations," and resulting desire to "pursue[]," groom, and "sexually assault" them); *Crider*, ¶ 26 (prior uncharged PFMA and charged SIWC/PFMA of same victim explainable by common motive—desire to "exert power and control" over her); *Madplume*, ¶¶ 26 and 30 (prior uncharged unwelcome sexual advance on alcohol-plied acquaintance and subsequent charged felony-murder of another predicated on similar conduct under similar circumstances in same location explainable by common motive to subject intoxicated subjects to non-consensual sexual contact in isolated intimate settings).

caused him to dislike Lake and discuss with others his perception of Lake's apparent affinity for child sex abuse. Lake, in turn, viewed Zitnik's statements and warnings about him to others as "blatant[] slander[]," which then caused him to have particularized animosity towards Zitnik[18] and ultimately motivated him, i.e., gave him reason, to provoke the initial altercation with Zitnik in the bar, and to then lay in wait and repeatedly stab him outside.

¶31 As referenced in the briefing and hearing on Lake's motion in limine, and even more particularly and explicitly at trial, Lake's prior child sex abuse comments and references were, by nature and frequency, likely to and likely did in fact seriously impugn his character in the eyes of the jury, thus implicating the general prohibition of Rule 404(b). However, at least as more generically stated here in the light most favorable to the State, no link in the chain of the State's theory of relevance of those other acts required or depended on an inference that Lake had a tendency, propensity, or predisposition to violently attack another *in conformity with his alleged affinity for child sex abuse*. Thus, as a preliminary matter of non-propensity relevance under M. R. Evid 401-02 and 404(b), we hold that the District Court did not abuse its discretion in denying Lake's motion in limine to *categorically* exclude any and all references to his prior child sex abuse comments and references. However, the relative probative value of the specific manner and frequency

---

[18] Compare *Blaz*, ¶¶ 13-19 ("general hostility" toward victim or "complete disregard for others" insufficient alone to be probative of motive to assault that person).

29

in which the State referenced and elicited witness references to them at trial is another matter under M. R. Evid. 403.

2. Rule 403 Limitation on Otherwise Admissible Rule 404(b) Evidence.

¶32 Evidence that is relevant and admissible under other rules of evidence is nonetheless subject to exclusion if the danger of unfair prejudice substantially outweighs its relative probative value. M. R. Evid. 403. Because all evidence relevant to prove an adverse claim or assertion is somewhat prejudicial to the other party, the Rule expressly applies, *inter alia*, only to evidence that poses a "danger of *unfair* prejudice." M. R. Evid. 403 (emphasis added). In turn, as pertinent here, otherwise admissible evidence generally poses a danger of unfair prejudice only if of a type that tends or is likely to arouse or provoke jury disdain and hostility for the other party without regard to its probative value in the context of the other evidence in the case. *See State v. Hicks*, 2013 MT 50, ¶ 24, 369 Mont. 165, 296 P.3d 1149 (internal citation omitted); M. R. Evid. 403 (in re "danger of unfair prejudice, confusion of the issues, . . . misleading the jury," or "needless presentation of cumulative evidence"). The need and demand for careful consideration and application of Rule 403 is particularly critical in the case of other bad acts evidence because, even when otherwise validly admissible for a non-propensity purpose, such evidence is inherently prejudicial insofar that it impugns or has the tendency to impugn the character of the accused based on matters not directly at issue, thus arousing or provoking hostility against him or her without regard to its probative value, thereby inviting or tempting the jury to find guilt on an improper basis. *See State v. Pulst*, 2015 MT 184, ¶ 19, 379 Mont. 494, 351 P.3d 687

30

(internal citations omitted); *State v. Franks*, 2014 MT 273, ¶¶ 15-16, 376 Mont. 431, 335 P.3d 725 (internal citations omitted); *Salvagni*, ¶ 48 (prior bad acts evidence has "potential to be highly prejudicial"); *Derbyshire*, ¶ 51 (prior bad acts evidence carries danger "that the jury will penalize [the accused] simply for his past bad character . . . or prejudge him and deny him a fair opportunity to defend against the particular crime charged"—internal citations omitted); *State v. Thompson*, 263 Mont. 17, 28-29, 865 P.2d 1125, 1132 (1993) (citing 1 J. Strong, *McCormick on Evidence* § 185 (4th ed. 1992)); *Old Chief v. United States*, 519 U.S. 172, 180-81, 117 S. Ct. 644, 650 (1997).[19] This inherent danger is even more acute when the other bad acts evidence pertains to child molestation. *Franks*, ¶ 17 (noting highly inflammatory nature of child molestation evidence). *Accord Pulst*, ¶ 19 (citing *Franks*). *See also State v. Van Kirk*, 2001 MT 184, ¶ 46, 306 Mont. 215, 32 P.3d 735 (noting "the highly inflammatory nature of child molestation evidence"); *United States v. Ham*, 998 F.2d 1247, 1252 (4th Cir. 1993) ("no evidence could be more inflammatory or more prejudicial than allegations of child molestation"). We have thus repeatedly warned districts courts, and the State, to exercise great caution in the use of prior acts evidence regarding child sexual abuse. *See Pulst*, ¶ 19; *Franks*, ¶ 17. *See also State v. Sage*, 2010 MT 156, ¶¶ 36-37, 357 Mont. 99, 235 P.3d 1284 ("courts must . . . exercise

---

[19] *See also State v. Stout*, 2010 MT 137, ¶ 84, 356 Mont. 468, 237 P.3d 37 (Nelson, J., dissenting) (bad "character evidence creates an unacceptable risk" that the jury "will be tempted, at least on a subconscious level, to penalize the defendant for . . . past misdeeds" or to "draw a deadly and decidedly improper . . . inference . . . from bad act to bad person to guilty person" or person in need of punishment regarding the uncharged conduct—citing various authorities and parenthetically quoting 1 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 4:28, 746 (3d ed. Thomson/West 2007)).

great caution when" allowing use of "potentially inflammatory propensity or character evidence" of a sexual nature even when admitted for some other limited legitimate purpose such as under the transaction rule).[20]

¶33    Here, in a preliminary limiting instruction before opening statements, the District Court cautioned the jury that it would hear evidence that Lake "made shocking statements about child sex abuse." The State then likewise generically told them that they would hear evidence that Lake commonly "made provocative and shocking comments to people about child sex abuse," and "made such a comment" to Zitnik which "offended" and "concerned" him. Had the State thereafter referenced and elicited testimony regarding Lake's prior child sex abuse comments and references in a similarly generic manner, the Rule 403 balance would have easily tipped in its favor. But it did not.

¶34    Rather, no sooner than making that generic statement, the State followed up by telling jurors that they would also hear that Lake "made a similar comment to" Cravens and told him and another "about having a dream about raping a 14-year-old girl." In its case-in-chief and on cross-examination of defense witnesses, the State then drove the proverbial truck through the crack in the door by repeatedly referencing and eliciting testimony from multiple witnesses that: (1) Lake referred to himself in the bar as "skull fucker"; (2) the name and term referred to "fucking" the skull of a child; (3) Lake's "skull fucker" nickname and references were well known to regulars at the bar; (4) he previously

---

[20] *See also State v. Murphy*, 2021 MT 268, ¶¶ 39-40, 406 Mont. 42, 497 P.3d 263 (Gustafson, J., dissenting).

made a similar comment directly to Zitnik about "fucking" a child's skull which offended him and in regard to which he discussed his resulting concerns about Lake with others in the bar; (5) Lake sang a song in the bar about "skull fucking"; (6) he repeatedly yelled out "skull fucker" in the bar; (7) he told a joke at the bar about a child in the trunk of his car who didn't like sex; (8) he previously disclosed to Cravens and another that he had a dream about raping a 14-year-old girl which then offended Cravens and caused him to dislike Lake; and (9) Cravens discussed Lake's child rape dream with other regulars, including Zitnik, which then furthered poisoned Zitnik against Lake. While defense counsel also made and elicited a few similarly explicit child sex abuse references in cross-examination of Cravens, and on direct examination of Lake, the unqualified denial of Lake's motion in limine, and the State's resulting exploitation of the ruling, left counsel little choice under the circumstances. A motion in limine that is sufficient to clearly and particularly identify the subject evidence and asserted basis for exclusion is sufficient to preserve the objection for appeal without need for continued or further contemporaneous objection at trial. *Crider*, ¶ 20 (internal citations omitted); *State v. Vukasin*, 2003 MT 230, ¶ 29, 317 Mont. 204, 75 P.3d 1284 (internal citations omitted). Lake's motion and supporting briefing in limine, as supplemented by his oral argument at motions hearing, were sufficiently clear and specific to preserve his asserted Rule 404(b) and 403 objections to the subsequent multitude of explicit references at trial to his "skull fucker" nickname and references, child rape dream, and boy-in-the-trunk joke.

¶35    The multitude of those explicit references not only portrayed Lake as a person of bad character with an affinity for child sex abuse, but also included direct characterizations of him as a child molester and a person who "likes to fuck children in the skull." Any of those statements and references would have alone seriously impugned his character and likely provoked jury disdain and hostility towards him. But the combination of the offensive nature, breadth, and multitude of those explicit references and characterizations was no doubt overwhelmingly prejudicial to his character regarding matters not directly at issue and without regard to probative value regarding the existence and extent of his animosity towards Zitnik. *See similarly, Derbyshire*, ¶¶ 52-53 (noting that, in contrast to an isolated reference to prior bad conduct subject to an adequate limiting instruction, the "numerous" references to the subject prior bad conduct significantly amplified its inherently prejudicial nature simply by "virtue of . . . repetition"). The relevant essence of the State's articulated motive theory was that Lake tried to kill Zitnik because he disliked him for "slander[ing]" him to others in the bar after he took offense with Lake's various child sex abuse comments and references at the bar. Given the highly inflammatory nature of even that generic subject matter, the State's need for evidentiary richness and narrative integrity in "adequately explain[ing] why [Lake] would want to kill a man who had warned others" about such concern required no more, without need for more explicit and repetitive detail.

¶36    Compounding matters, a number of the multitude of trial references to Lake's prior child sex abuse comments had little or no probative value even in that regard. For example,

34

no witness testified during the State's case-in-chief that Zitnik in fact called or referred to Lake as a "child molester"—only that Zitnik did *not like* child molesters and thus did not like Lake based on his various child sex abuse comments. Similarly, though Cravens testified that Zitnik was further offended by Lake when *Cravens* told Zitnik about Lake's child rape dream, Zitnik never testified that he saw Lake "gyrate" when telling Cravens about it, or that he even heard about the dream at all, much less that it further fueled *Zitnik's* animosity toward Lake. The Bartender and Cravens both testified that it was Cravens, not Zitnik, who referred to Lake to others as a child molester or "cho mo."[21] The Bartender was unaware of Zitnik ever saying any "mean things to [Lake]," other than the crass and standard "shit-talking" that often took place between them. The facts that *Cravens and others* in the bar were or may reasonably have been offended by Lake's child sex abuse comments and references, and that *Cravens* thus called and referred to Lake as a child molester, had no direct or indirect probative value as to whether, why, and to what extent Lake disliked Zitnik, nor did the multiple trial references to the explicit nature, details, and manner of disclosure of Lake's child rape dream.

¶37  Perhaps the farthest out of bounds was the State's cross-examination of Chadwick's opinion of Lake as an honest and truthful person.[22] As an exception to the general rule of

---

[21] Cravens similarly testified in his pretrial deposition that he never heard Zitnik call Lake a child molester and simply did not know whether Zitnik had ever referred to Lake as a child molester to others.

[22] Chadwick also testified, *inter alia*, to his specific observation of Lake's stated desire for a "peaceful resolution" of the ongoing animosity between him and Zitnik. He did not state any opinion or otherwise comment on Lake's general character for peacefulness.

Rule 404(a) barring propensity conformance evidence, an accused may "present evidence that he or she has a pertinent good character trait inconsistent with the alleged offense (e.g., that he or she is honest, trustworthy, has moral integrity, or is a peaceful, non-violent, loving, caring, or law-abiding person) for the purpose of supporting an inference that he or she is not guilty of the offense." *Pelletier*, ¶ 16 (construing M. R. Evid. 404(a)(1)—internal citations omitted); *State v. Gowan*, 2000 MT 277, ¶¶ 22-23, 302 Mont. 127, 13 P.3d 376. By doing so, however, the accused "opens the door" to "otherwise inadmissible cross-examination [and] extrinsic evidence regarding specific instances of prior conduct [that are] *relevant* to impeach or rebut the subject good character testimony." *Pelletier*, ¶ 16 (internal citations omitted—emphasis added).

¶38 Depending upon the circumstances at issue, Rule 404(a)(1) impeachment and rebuttal evidence has two purposes. The first is to rebut and counter the good character propensity inference placed before the jury by the defendant with a basis for a contrary inference. In the case of a third-party good character witness, the second is to impeach the credibility of the good character testimony by challenging the sufficiency of the witness's basis of knowledge of the defendant. *Pelletier*, ¶ 16. However, "the scope of permissible Rule 404(a)(1) cross-examination or rebuttal evidence is not unlimited—it must be relevant for the Rule 404(a)(1) purpose offered and not unfairly prejudicial." *Pelletier*, ¶ 16 (internal citations omitted). *Accord State v. Clark*, 209 Mont. 473, 488-91, 682 P.2d 1339, 1347-48 (1984) (defendant "opened the door" to permissible cross-examination regarding specific instances of conduct directly related to pertinent character traits put at issue).

¶39      Here, Chadwick merely testified that he thought Lake was a "100 percent" honest and truthful person.    However, without express or implied reference or regard to that opinion, the State then questioned him non-sequitur as to whether he was aware of Lake's child sex dream, that "he made the motion like . . . he was having sex with . . . th[e] 14-year-old" while describing the dream, would randomly "yell . . . 'skull fucker' in the bar," and had told "a joke . . about a five-year-old in the trunk of a car."   Compounding matters further, the State then asked whether it made "sense *to* [*Chadwick*] that [*other*] *people* might have concerns if somebody is sharing this information," and "making light of and maybe even boasting about sexual abuse of children."   The colloquy went on:

[State]:      Okay.  Let me tell you what the joke was, all right?

                  . . .

[State]:      And I guess the jury can decide whether they think it's off-color or something beyond that.  The joke was – and he told this to the police after he was detained – "What's black and blue and doesn't like sex?" [A]nd the answer is, "The five-year-old in my trunk."  That seems to be a little bit beyond off-color; wouldn't you agree with that?

                  . . .

[State]:      So Mr. Lake's testimony yesterday was that some people thought it was funny and some people didn't.  So do you know a lot of people who think that joke is funny?

                  . . .

[State]:      [D]o you think it's reasonable that people at Jesters were not just concerned about [Lake's child rape] dream . . . and the way he related it but also his comments about being a skull fucker and the jokes and that sort of thing?

                  . . .

37

[State]:    Do you think it would be reasonable for a person that had a 14-year-old daughter to be offended about a person telling them about a dream that they had had—

[Defense]:   Objection. Speculation and not relevant.

. . .

[Court]:    Overruled.

[State]:    Do you think it would be reasonable or unreasonable for somebody who had a 14-year-old daughter to be offended by that?

¶40    Whether Chadwick was aware of the occurrence and details of Lake's child sex dream, that "he made [a] motion like . . . he was having sex with . . . [a] 14-year-old" while disclosing it, that he would "yell . . . 'skull fucker' in the bar," and had told "a joke about a five-year-old in the trunk of a car," was wholly irrelevant to impeach or rebut his limited opinion regarding Lake's character for truthfulness and honesty. Even further afield, similarly irrelevant to Lake's character for honesty and truthfulness were *Chadwick's opinions* as to whether it made "sense" that "people might have concerns" about Lake's statements, whether his child sex abuse joke was "beyond off-color" or "funny," or whether "it [was] reasonable" that "people at Jesters" were concerned about Lake's child rape dream, "the way he related it," "his comments about being a skull fucker[,] and the jokes and that sort of thing." None of those matters had any probative value whatsoever as to whether Lake was in fact generally trustworthy and truthful, whether Chadwick had a sufficient knowledge base to conclude that he was, or whether and to what extent Lake had sufficient animosity against Zitnik to want to kill him.

38

¶41     In assessing the relative probative value of particular evidence against the danger of

unfair prejudice under Rule 403, courts should consider:

> not only . . . the item in question but [also] any actually available substitutes
> as well.  If an alternative . . . [is available with] substantially the same or
> greater probative value but a lower danger of unfair prejudice, sound judicial
> discretion would discount the value of the item first offered and exclude it if
> its discounted probative value were substantially outweighed by unfairly
> prejudicial risk.

*Old Chief*, 519 U.S. at 182-83, 117 S. Ct. at 651 (construing Fed. R. Evid. 403).  While it

must of course consider the proponent's "need for evidentiary richness[,] . . . narrative

integrity," and prerogative in choosing what evidence to present in support of that party's

burden of proof, the court should nonetheless "reasonably apply some discount to the

probative value of an item of evidence when . . . less prejudicial but equally probative

evidence" is available.  *Old Chief*, 519 U.S. at 183-84, 117 S. Ct. at 651-52.  Consequently,

"what counts as the Rule 403 'probative value' of an item of evidence, as distinct from its

Rule 401 'relevance,'" includes consideration, *inter alia*, of "compar[ative] evidentiary

alternatives," particularly in the context of Rule 404(b) other acts evidence that has both a

"legitimate" purpose and an inherently "illegitimate" tendency or effect.  *Old Chief*, 519

U.S. at 184-85, 117 S. Ct. at 652.  *See also State v. Pendergrass*, 179 Mont. 106, 111-13,

586 P.2d 691, 694-95 (1978) ("[t]he foundation for admission of prejudicial evidence is a

showing by the State to establish its *substantial necessity* or instructive value"—holding

that admission of recording of victim's "emotional . . . outpourings"/call for help "in the

immediate aftermath of a violent crime" was reversible error as unnecessary for proffered

purpose of proving that rape had occurred and bolstering victim credibility in light of other "clear proof" of the alleged rape and absence of any issue as to her credibility).

¶42 Here, as at least generally asserted by defense counsel at the pretrial motions hearing, the State could have readily accomplished its asserted non-propensity purpose by eliciting more generic testimony from Cravens, the Bartender, and Zitnik, as known to each, that Zitnik was offended by various child sex abuse comments and references previously made by Lake at the bar, he thus disliked Lake, was concerned about him, and discussed those concerns with others in the bar, which then caused Lake to dislike and have animosity toward Zitnik as manifest in the altercation between them in the bar before the stabbing outside. The State could have further supported that theory with testimony from Detective Lawrence more generically stating the pertinent essence of Lake's post-arrest statements to police that an unidentified man had previously antagonized and slandered him to other bar regulars "about some of the things [he] said." Such limited and generic reference to Lake's prior child sex abuse comments and references would still have had the same or similar probative value as proof of the existence, nature, and extent of Lake's animosity towards Zitnik, and thus his motive to kill him, but without unnecessary and highly inflammatory explicit and repetitive reference to Lake's "skull fucker" nickname and references, child rape dream, and boy-in-the-trunk joke.

¶43 We have long recognized that adequate limiting instructions under M. R. Evid. 105 are often sufficient to eliminate, or at least reduce, the risk of unfair prejudice where prior bad acts evidence is both highly relevant and inherently prejudicial. *See Blaz*, ¶ 20; *State*

40

*v. Hantz*, 2013 MT 311, ¶ 44, 372 Mont. 281, 311 P.3d 800. Not so, however, when the relative probative value of the evidence is minimal or non-existent, and the relative danger of unfair prejudice is high. *See Franks*, ¶¶ 16-20; *Sage*, ¶ 42. Here, even before opening statements, the trial started with a limiting instruction which, though generic in nature, brought the highly offensive and inherently prejudicial matter of Lake's prior uncharged bad acts front and center to the jury's attention and focus from the outset. The State then exploited and emphasized that heightened focus at every available opportunity with multiple witnesses, thereby permeating and polluting the trial with repetitive and unnecessarily explicit references to a highly offensive and prejudicial subject matter that, at best, had only ancillary relevance to the facts centrally at issue in the case. Under these circumstances, even the twice-given limiting instruction was simply not adequate to eliminate or fairly reduce the manifest danger of unfair prejudice posed by the explicit and repetitive manner in which those highly inflammatory prior bad acts were put before the jury in this case under the court's unqualified denial of Lake's motion in limine.

¶44     While district courts have broad discretion under M. R. Evid. 401-03 and 404(b) to determine and weigh the probative value of other acts evidence against the relative risk of unfair prejudice, confusion of the issues, or jury distraction, we have long recognized and cautioned that, to prevent permissible uses from swallowing the general rule, trial courts "*must ensure* that the use" of prior bad acts evidence under Rule 404(b) is "clearly justified and *carefully limited*." *Madplume*, ¶ 23 (quoting *Aakre*, ¶ 12—emphasis added). *Accord State v. Crist*, 253 Mont. 442, 444, 833 P.2d 1052, 1054 (1992) ("general rule of

Rule 404(b) . . . must be strictly enforced[] except where" an exception "is clearly justified and . . . carefully limited"—internal citations omitted); *State v. Just*, 184 Mont. 262, 271-72, 602 P.2d 957, 962 (1979) (pre-Rules citation omitted), *overruled on other grounds by Salvagni*, ¶ 3. Unfortunately, here, the otherwise valid use of the relevant essence of the subject prior bad acts evidence was not carefully limited to avoid its manifestly inherent risk of unfair prejudice. We hold that the District Court erroneously allowed the State to reference and elicit testimony regarding Lake's prior child sex abuse comments and references in an explicit and repetitive manner that was unfairly prejudicial under the circumstances in this case.

3. Transaction Rule – § 26-1-103, MCA.

¶45 As an alternative to admission under M. R. Evid. 404(b), the State asserts that Lake's prior child sex abuse comments and references were independently admissible under the transaction rule codified in § 26-1-103, MCA ("[w]here [a] declaration, act, or omission forms part of a transaction which is itself the fact in dispute or evidence of that fact, such declaration, act, or omission is evidence as part of the transaction"). Pursuant to the transaction rule, evidence of a declaration, act, or omission that was inextricably linked or intertwined with the alleged criminal conduct of the accused *may* be admissible as proof of a pertinent element of a charged offense if "explanatory of a fact in dispute" and thus relevant to "provide a comprehensive and complete picture" of the alleged criminal conduct of the accused. *State v. Guill*, 2010 MT 69, ¶ 36, 355 Mont. 490, 228 P.3d 1152 (citing *State v. Bauer*, 2002 MT 7, ¶ 23, 308 Mont. 99, 39 P.3d 689). *Accord Ellison*, ¶ 14

(citing *Guill*). *Compare Sage*, ¶¶ 39-41 (noting that all evidence that "provides some context for the charged conduct" and which "might 'help explain' the charged conduct" is not necessarily so "inextricably intertwined" with the accused's criminal conduct to be part and parcel of the crime); *Derbyshire*, ¶¶ 34-40 (similarly rejecting various State assertions of contextual need or relevance). While we have discarded the common law concepts of *res gestae* and *corpus delicti* "which, like magic incantations, had been invoked . . . [to] admit evidence of questionable value without subjecting it to critical analysis," we have continued to recognize the validity of the statutory transaction rule where applicable by its terms, and relevant in the context of a particular case. *Guill*, ¶¶ 26-27 (internal citations omitted).

¶46 The transaction rule long predates modern M. R. Evid. 404(b) and, by its express terms, does not necessarily apply only to other acts of an accused. *See* § 26-1-103, MCA (reenacted Code of Civil Procedure 1895 from prior 1877 enactment); *compare* M. R. Evid. 404(b). However, to the extent that it does and the evidence would otherwise be excluded as propensity evidence, the transaction rule may be an "other purpose" exception to the general exclusionary rule of M. R. Evid. 404(b) to the extent the subject evidence is relevant in a particular case. *See, e.g.*, *State v. Haithcox*, 2019 MT 201, ¶ 17, 397 Mont. 103, 447 P.3d 452 (transaction rule is a statutory "other purpose" exception to general rule of M. R. Evid. 404(b) and thus is not a conduit for admission of evidence that "would otherwise be excluded by" Rules 404(b) and 403—internal citations omitted); *Guill*, ¶ 26 (noting that we have "endeavored to cabin application of the transaction rule to prevent it

43

from" swallowing or marginalizing the general rule of M. R. Evid. 404(b)—internal citations omitted); *State v. Berosik*, 2009 MT 260, ¶ 45, 352 Mont. 16, 214 P.3d 776 (transaction rule evidence is relevant to inform finder of fact of "what happened prior to the alleged offense" thus allowing evaluation of "the evidence in the context in which the alleged criminal act occurred"—internal citations omitted); *Derbyshire*, ¶¶ 31-33 (noting that various articulated transaction rule "standards . . . evolved from" our "pre-Rule 404(b)" other acts "jurisprudence" and that we have since discarded common law *res gestae* and *corpus delicti* concepts in favor of application of particular rules of evidence specifically applicable to the factual situation at issue—internal citations omitted); *State v. Gittens*, 2008 MT 55, ¶ 37, 341 Mont. 450, 178 P.3d 91 (recognizing transaction rule is a codified "other purpose" exception to M. R. Evid. 404(b)).[23]

¶47 Like any "other purpose" exception to Rule 404(b) or, for that matter, any otherwise admissible evidence, evidence otherwise admissible under the transaction rule is nonetheless subject to exclusion under M. R. Evid. 403. *Guill*, ¶ 26; *Berosik*, ¶ 46; *State*

---

[23] To the extent that it applies to other acts of an accused, some overlap exists between the transaction rule and "other purposes" exception to modern M. R. Evid. 404(b). *See State v. Schlaps*, 78 Mont. 560, 574-75, 254 P. 858, 861 (1927) (facts relevant to prove an element of a charged offense because they are probative of "identity, motive, intent[,] or of a system employed" are no less relevant and admissible because "they may prove or tend to prove the commission of an independent offense"—citing § 10511, RCM (1921) (now § 26-1-103, MCA)); *compare* M. R. Evid. 404(b) ("[e]vidence of other crimes, wrongs, or acts . . . may . . . be admissible for other purposes, such as proof of motive, . . . intent, . . . plan, . . . [or] identity"). *See also Guill*, ¶ 50 (Nelson, J., concurring—noting § 26-1-103, MCA, as "an historical artifact . . . straight out of" § 1683 of David Dudley Field's *The Code of Civil Procedure of the State of New-York*, Part IV (1850), and which should be discarded in the wake of the 1976 "adoption of the Montana Rules of Evidence" or at least construed within the Rule 404(b) framework).

*v. Detonancour*, 2001 MT 213, ¶¶ 29-31, 306 Mont. 389, 34 P.3d 487. *See also Derbyshire*, ¶¶ 28-40; M. R. Evid. 403 (in re exclusion of otherwise relevant evidence). Consequently, alternative characterization of Lake's prior child sex abuse comments as relevant transaction rule evidence does not preclude or circumvent the foregoing application of M. R. Evid. 403 here.

**CONCLUSION**

¶48 As a preliminary matter of non-propensity relevance under M. R. Evid 401-02 and the "other purpose" exception to Rule 404(b), we hold that the District Court did not abuse its discretion in denying Lake's motion in limine to *categorically* exclude any and all references to his prior child sex abuse comments and references. We further hold, however, that the court erroneously allowed the State to reference and elicit testimony regarding Lake's prior child sex abuse comments and references in an explicit and repetitive manner that was unfairly prejudicial under the circumstances in this case. We therefore hereby reverse Lake's 2019 attempted deliberate homicide conviction and remand for a new trial on that offense.

/S/ DIRK M. SANDEFUR

We concur:

/S/ LAURIE McKINNON
/S/ BETH BAKER
/S/ INGRID GUSTAFSON
/S/ JIM RICE